## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

THE BOBRICK CORPORATION
11611 Hart Street
North Hollywood, CA 91605-5882

BOBRICK WASHROOM EQUIPMENT, INC.
11611 Hart Street
North Hollywood, CA 91605-5882

and

THE HORNYAK GROUP, INC.
824 Philadelphia Pike
Wilmington, DE 19809

                                        Plaintiffs,

                  v.

SANTANA PRODUCTS, INC.
1300 Meylert Avenue
Scranton, PA 18509

SANTANA PRODUCTS LIQUIDATING TRUST
1300 Meylert Avenue
Scranton, PA 18509

MICHAEL T. LYNCH, SR.
1512 Adams Avenue
Dunmore, PA 18512

MICHAEL T. LYNCH, JR.
829 Grandview Street
Scranton, PA 18509

JOHN A. CARNEY
1017 Delaware Street
Scranton, PA 18509

JAMES M. GAVIGAN
106 Abbey Drive
Clarks Summit, PA 18411

and

WILLIAM E. JACKSON, ESQ.
1199 North Fairfax Street, Suite 900
Alexandria, VA 22314

                                        Defendants

CIVIL ACTION

3: CV 07-1521

No. _____

JURY TRIAL DEMANDED

FILED
SCRANTON

AUG 1 7 2007

PER _____
DEPUTY CLERK

## FIRST VERIFIED COMPLAINT

## TABLE OF CONTENTS

Page

I.    NATURE OF ACTION ................................................................................ 1

II.   THE PARTIES ........................................................................................... 3

III.  JURISDICTION ......................................................................................... 7

IV.   PROCEDURAL HISTORY ........................................................................ 8

    A.    Settlement and Release of the 1994 TPMC Litigation ........................... 8

    B.    The Filing of the 1996 Litigation ........................................................ 9

    C.    Elements of Proof Required for a Claim Under Section 1 of the Sherman Act ............................................................................................. 10

    D.    Elements of Proof Required for a Claim Under Section 2 of Sherman Act ......... 10

    E.    Elements of Proof Required for a Claim Under Section 43(a) of the Lanham Act ........................................................................................ 11

    F.    Elements of Proof Required for a Claim of Tortious Interference With Prospective Contractual Relationships ............................................... 12

    G.    The Allegations in the 1996 Litigation ................................................ 13

    H.    The New York Sylvester Litigation ..................................................... 15

V.    DISCOVERY IN THE 1996 LITIGATION ............................................. 16

    A.    The Magnitude of Discovery ............................................................... 17

    B.    Santana's Discovery Obfuscation ....................................................... 18

    C.    Discovery Established that Santana Had No Basis in Fact or Law to Initiate or Continue to Prosecute Its Claims Against Hornyak or Bobrick in the 1996 Litigation ........................................................................ 20

        (i)  Discovery as to Hornyak Revealed the Baseless Nature of Santana's Claims .................................................................... 25

        (ii)  Discovery as to Bobrick Revealed the Baseless Nature of Santana's Claims .................................................................... 35

VI.   PROCEDURAL HISTORY FOLLOWING DISCOVERY IN THE 1996 LITIGATION ......................................................................................... 42

    A.    Cross Motions for Summary Judgment ................................................ 42

    B.    Demand for Withdrawal of Santana's Claims ...................................... 42

    C.    Resolution of the Parties' Cross Motions for Summary Judgment ......... 46

    D.    Santana's Appeal to the United States Court of Appeals for the Third Circuit ............................................................................................... 54

    E.    Santana's Petition for Rehearing En Banc and Panel Rehearing ........... 56

**TABLE OF CONTENTS**
(continued)

**Page**

F.      Santana's Petition for a Writ of Certiorari ...........................................................57

G.      Subsequent Litigation Following the Conclusion of the 1996 Litigation ............57

      (i)  Subsequent Santana Products, Inc. v. Sylvester & Associates, Ltd. and
      Frederick E. Sylvester Case ...................................................................................57

H.      Vogel v. Santana, et al., (C.P. :Lackawanna and Pennsylvania Superior
      Court) ....................................................................................................................65

      (i)  Newly Discovered Evidence ..........................................................................65

      (ii)  Santana's Preliminary Objections ................................................................68

VII.    COUNT I – VIOLATION OF PENNSYLVANIA'S DRAGONETTI ACT ..................72

VIII.   COUNT II – ABUSE OF PROCESS ...........................................................................75

## I.    **NATURE OF ACTION**

1. This is an action for wrongful use of civil proceedings and abuse of process under applicable Pennsylvania state law, seeking to recover damages incurred by Plaintiffs from being forced to defend against certain complex federal litigation initiated in 1996 by Defendants and perpetuated for nine long tortuous years without probable cause in the United States District Court for the Middle District of Pennsylvania, the United States Court of Appeals for the Third Circuit, and the Supreme Court of the United States. That litigation was finally successfully terminated on November 28, 2005 fully in favor of the Plaintiffs herein.

2. Specifically, in October, 1996, Defendant Santana Products, Inc., at the direction and approval of Defendants Michael T. Lynch, Sr., Michael T. Lynch, Jr., John A. Carney, James M. Gavigan and William E. Jackson, Esquire sued Plaintiffs The Hornyak Group, Inc., The Bobrick Corporation, Bobrick Washroom Equipment, Inc. and others for violations of Sections 1 and 2 of the Sherman Act, Section 43(a) of the Lanham Act and tortious interference with prospective advantage.

3. Without any basis in law or fact, Defendants commenced and continued to prosecute their meritless claims against Plaintiffs for nine years, even after fatal flaws were brought to their attention both before and after the litigation was initiated. At most, Defendants had an arguable claim for injunctive relief only against The Bobrick Corporation and Bobrick Washroom Equipment, Inc. under the Lanham Act for certain private contracts. However, instead of pursing that singular claim, Defendants improperly complicated the proceedings by piling on additional antitrust claims seeking treble damages and attorneys' fees, and a claim for tortious interference with prospective advantage seeking punitive damages, for which they had no good faith basis in fact or law. Defendants also further exacerbated the proceedings by piling on

1

innocent additional parties, including three of Bobrick's independent architectural representatives: The Hornyak Group, Vogel Sales Company, Sylvester & Associates, Ltd. and even Frederick Sylvester personally. Defendants had no good faith belief that those entities were involved in any wrong doing nor did Defendants possess any evidence or have knowledge of any facts that supported any valid claims against those innocent parties. Plaintiffs pursue here an action for wrongful use of civil proceedings and abuse of process against Defendants for bringing such baseless claims against The Hornyak Group, Inc. and for bringing all but the limited Lanham Act injunctive relief claim against The Bobrick Corporation and Bobrick Washroom Equipment, Inc. (collectively "Bobrick").

4. Santana Products, Inc.'s ("Santana") bad faith is supported by evidence that it, along with counsel, commenced litigation without first conducting an adequate investigation into the merits of its claims and persisted in the prosecution of the litigation even though it knew it could not prove injury and damages causally related to the alleged illegal conduct of each defendant.

5. Plaintiffs bring this action now because new documents have recently come to light in a parallel pending action brought by Vogel Sales Company, which further establish and underscore Defendants' knowledge of the baseless nature of the claims they brought in the underlying action. Specifically, recently uncovered pre-complaint correspondence among Santana's counsel reveals Defendants' improper motive for bringing certain claims against certain parties, which was admittedly done solely with the hope that innocent parties would be forced to settle in the face of harassing and burdensome litigation. Newly produced correspondence among Santana's counsel also establish Defendants' pre-complaint knowledge of

the need for further investigation and the existence of evidentiary deficiencies, as well as factual and legal difficulties inherent with their antitrust claims in particular.

6. Defendants lacked a good faith basis in fact or law to bring their claims. As a result, for the reasons stated herein, Defendants have engaged in a Malicious Use of Civil Proceedings, in violation of Pennsylvania's Dragonetti Act, 42 Pa. C.S.A. §§ 8351-8354, and an Abuse of Process under Pennsylvania's common law.

## II.    THE PARTIES

7. Plaintiff The Hornyak Group, Inc. ("Hornyak") is a Wilmington, Delaware corporation with its principal place of business at 824 Philadelphia Pike, Wilmington, DE 19809.

8. Hornyak was engaged in the sale of washroom accessories and toilet partitions, and to that end, served as an independent architectural sales representative for Bobrick, during the relevant time period.

9. Hornyak served as an independent architectural sales representative for Bobrick Washroom Equipment, Inc. in only eastern Pennsylvania (east of Harrisburg), southern New Jersey (south of Trenton), and the State of Delaware, during the relevant time period. See Hornyak Dep. at 14, Exh. 1 hereto.

10. The Bobrick Corporation is a California corporation headquartered in North Hollywood, California. The Bobrick Corporation is the parent of Bobrick Washroom Equipment, Inc.

11. Plaintiff Bobrick Washroom Equipment, Inc. (collectively with Hornyak and The Bobrick Corporation, "Plaintiffs") is a California corporation headquartered in North Hollywood, California, with manufacturing plants in New York, Colorado, Oklahoma, Tennessee and Ontario, Canada.

12. Bobrick Washroom Equipment, Inc. manufactures and sells, and Hornyak sold, toilet partitions made of a material called solid phenolic, as well as toilet partitions of laminated plastic over particle board core. Neither Bobrick nor Hornyak ever sold solid plastic high-density polyethylene ("HDPE") toilet partitions.

13. Defendant Santana Products, Inc. ("Santana") was a Virginia corporation with its principal place of business at 1300 Meylert Avenue, Scranton, Pennsylvania 18509-2225 during the relevant time period.

14. Defendant Santana was a leading manufacturer of toilet partitions in the United States and, indeed, advertised itself as the largest manufacturer of HDPE toilet partitions in the United States until it was acquired in late 2004 by Winston Partners, a private investment firm based in McLean, Virginia, and Theo Capital. Despite that sale, announced on January 12, 2005, Defendants continued to litigate and fund the underlying baseless case described herein against Hornyak and Bobrick.

15. Defendant Santana Products Liquidating Trust ("SP Liquidating") is a Liquidating Trust, formed in Scranton Pennsylvania, on or around November 30, 2004, pursuant to a "Liquidating Trust Agreement For Assets of Santana Products, Inc." A copy of the "Trust Agreement" is attached hereto as Exh. 2.

16. It was recently discovered that SP Liquidating was created, among other reasons, to receive the assets and/or liabilities of Santana which were retained by the Lynch Family, after substantially all of the assets of Santana were sold to Winston Partners in November 2004, including those relating to the underlying case against Hornyak and Bobrick. See Exh. 2 hereto.

17.  Defendants Michael T. Lynch, Sr. and Michael T. Lynch, Jr. are trustees of SP Liquidating, pursuant to the Trust Agreement.  Id.

18.  After the above referenced sale of Santana's assets in November, 2004, SP Liquidating continued to provide funds dedicated to pursuing the underlying baseless case against Hornyak and Bobrick.  See Excerpts of 11/9/06 James Gavigan Dep. ("Gavigan Dep") at p. 18, Exh. 3 hereto.

19.  Michael T. Lynch, Sr. ("Lynch, Sr.") is an individual residing at 151 Adams Avenue, Dunmore, Pennsylvania 18512.

20.  Michael T. Lynch, Jr. ("Lynch, Jr.") is an individual residing at 829 Grandview Street, Scranton, Pennsylvania  18509.

21.  Lynch, Sr. and Lynch, Jr. were shareholders of Santana during the relevant time period. See Exh. 2 hereto.

22.  From 1978 until November 2004, the Lynch Family owned and controlled Santana.

23.  Until November 2004, Lynch, Sr. served as the President of Santana.

24.  The Lynch family retained a minority equity interest in Santana after November 2004.

25.  Defendant Lynch, Jr. was a member of the management control group responsible for continuing the underlying baseless litigation.  See 11/9/06 Gavigan Dep. at pp. 50-51, 60-62, Exh. 3 hereto.

26.  Lynch, Sr. authorized the initiation and continuation of the underlying baseless litigation against Hornyak and Bobrick described herein.  See 11/9/06 Gavigan Dep. at pp. 50-51, 60-62, Exh. 3 hereto.

27.  John A. Carney ("Carney") is an individual residing at 1017 Delaware Street, Scranton, Pennsylvania 18509.

28.  Defendant Carney was the General Manager of Santana until November, 2004, as well as a member of the management control group responsible for initiating and continuing the underlying baseless litigation against Hornyak and Bobrick.  Id.

29.  James M. Gavigan ("Gavigan") is an individual residing at 106 Abbey Drive, Clarks Summit, Pennsylvania 18411.

30.  Defendant Gavigan was the Chief Financial Officer of Santana until November, 2004, as well as a member of the management control group responsible for initiating and continuing the underlying baseless litigation against Hornyak and Bobrick.  Id.  See also 11/9/06 Gavigan Dep. at p. 5, Exh. 3 hereto.

31.  William E. Jackson ("Jackson") is an attorney and a member of the law firm of Stites & Harbison P.L.L.C., located at 1199 North Fairfax Street, Suite 900, Alexandria, VA 22314.  Until January 1, 2004, Defendant Jackson was a member of the law firm of Larson & Taylor located at the same address, at which Jackson and others allegedly investigated and then prepared the underlying baseless litigation against Hornyak and Bobrick, after discussions with the other Defendants.  See 11/9/06 Gavigan Dep. at pp. 60-62, Exh. 3 hereto.  Larson & Taylor merged with Stites & Harbison on January 1, 2004.

32.  As further discussed below, Defendant Jackson was retained by Santana and the Lynch Family to initiate, maintain and continue the underlying baseless litigation against Hornyak and Bobrick, as Santana's primary counsel.  See 11/9/06 Gavigan Dep. at pp. 41 and 48, Exh. 3 hereto.  See also 1/6/00 Gavigan Dep. at p. 25, Exh. 4 hereto.  Other attorneys assisted Jackson in that conduct.

### III.    JURISDICTION

33.    Plaintiff The Bobrick Corporation is a California corporation with its principal place of business in California.

34.    Plaintiff Bobrick Washroom Equipment, Inc. is a California corporation with its principal place of business in California.

35.    Plaintiff Hornyak is a Delaware corporation with its principal place of business in Delaware.

36.    Defendant Santana is a Pennsylvania corporation with its principal place of business in Pennsylvania.

37.    Defendants Lynch, Sr., Lynch, Jr., Carney and Gavigan are residents of Pennsylvania.

38.    Defendant Jackson resides in West Virginia with his principal place of business in Virginia.

39.    The amount in controversy exceeds $75,000.

40.    This Court has diversity jurisdiction over this matter pursuant to 28 U.S.C § 1332 because the parties in this action are citizens of different states and corporations of different states and the amount in controversy exceeds $75,000.

41.    Venue in this Court is proper because all Defendants, with the exception of Defendant Jackson, are located in the Middle District of Pennsylvania.  Additionally, this case relates to a prior related case, brought by Defendants, Santana Products, Inc. v. Bobrick Washroom Equipment, Inc., 249 F.Supp.2d 463 (M.D.Pa. 2003), which was heard by the Honorable Chief Judge Thomas I. Vanaskie for the United States District Court for the Middle District of Pennsylvania.

## IV.    PROCEDURAL HISTORY

### A.    Settlement and Release of the 1994 TPMC Litigation

42.  On November 30, 1994, Santana filed an unverified complaint in the United

States District Court for the Middle District of Pennsylvania against eleven toilet partition

manufacturers and a trade association called the Toilet Partition Manufacturers Counsel

("TPMC") (the "1994 TPMC Litigation").  Santana Products, Inc. v. Toilet Partition

Manufacturers Council, et al., M.D. Pa., Civil Action No. 3:CV-94-1962 (McClure, Jr., J.).

Neither Bobrick nor Hornyak were named therein as a defendant.  Defendant Jackson was the

primary counsel for Santana in that matter as well.

43.  In the 1994 TPMC Litigation, Santana alleged violations of Sections 1 and 2 of

the Sherman Antitrust Act and Section 43 of the Lanham Act, as well as tortious interference

with prospective contractual relations.  Essentially, Santana accused the members of the TPMC

of utilizing various "fire scare" marketing tactics in an effort to convince architects, specifiers

and public officials not to specify and/or purchase toilet partitions that are (like Santana's toilet

partitions) composed of untreated HDPE.

44.  Weeks after Santana filed the 1994 TPMC Litigation, the parties thereto

commenced negotiations to settle the case, and, on January 27, 1995, prior to taking any

discovery, Santana settled the 1994 TPMC Litigation for a nuisance amount in a confidential

agreement as to all 13 defendants (TPMC, Formica, and 11 toilet partition manufacturers) and

released "DEFENDANTS, SP LIQUIDATING COMPANY, TOILET PARTITION

MANUFACTURERS COUNCIL, and their respective officers, directors, parents subsidiaries,

employees, agents and attorneys."  See Settlement Agreement and several Releases and

Covenants Not to Sue, dated January 27, 1995 (emphasis in original).  At the time of the

settlement, Formica was involved in merger discussions, which explains the prompt nuisance

settlement. On information and belief, the other eleven individual manufacturer defendants paid

only $5,000.00 each to settle the case. Neither Bobrick nor Hornyak was a party to the

Settlement Agreement or even referenced therein. Nor did they have any knowledge of that

settlement until 1997.

**B.    The Filing of the 1996 Litigation**

45. On October 1, 1996, Santana filed an unverified complaint in the United States

District Court for the Middle District of Pennsylvania, naming as defendants Bobrick Washroom

Equipment, Inc. and it's parent company, The Bobrick Corporation, together with three

independent architectural sales representatives, including Hornyak. The case was assigned to the

Honorable Chief Judge Thomas I. Vanaskie. That litigation is the underlying proceeding that

gives rise to these claims and shall be referred to hereinafter as the "1996 Litigation." The

unverified Complaint was signed by Gerald J. Butler, Esquire, at the direction of Defendant

Jackson, who, it is believed, primarily prepared the Complaint.

46. In the Complaint, Santana purported to state the same four claims it had

asserted against the TPMC two years earlier:

> A violation of Section 1 of the Sherman Antitrust Act, 15 U.S.C. § 1, see
> Count I of the Complaint, ¶¶ 67-73, Exh. 5;
>
> A violation of Section 2 of the Sherman Antitrust Act, 15 U.S.C. § 2, see
> Count II of the Complaint, ¶¶ 74-78, Exh. 5;
>
> A violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, see
> Count III of the Complaint, ¶¶ 79-82, Exh. 5; and
>
> Tortious interference with prospective contractual relations, see Count IV
> of the Complaint, ¶¶ 83-85, Exh. 5.

**C.    Elements of Proof Required for a Claim Under Section 1 of the Sherman Act**

47.  Section 1 of the Sherman Act, 15 U.S.C. § 1 ("Section 1"), provides that "every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States . . . is declared to be illegal."

48.  In order to state a claim under Section 1, it is well-established that a plaintiff must prove "(1) concerted action by the defendants; (2) that produced anticompetitive effects within the relevant product and geographic markets; (3) that the objects of the conduct pursuant to the concerted action were illegal; and (4) that it was injured as a proximate result of the concerted action." Santana Products, 249 F. Supp.2d 463, 503 (M.D.Pa. 2003)(Vanaskie, C. J.) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co., 998 F.2d 1224, 1229 (3d Cir. 1993)).

49.  A Section 1 plaintiff must also prove that there is a restraint of trade and that the restraint is unreasonable. Santana Products, 401 F.3d 123, 131-32 (3d Cir. 2005). Without a restraint, there is no unreasonable restraint of trade. Moreover, injury to a competitor is not proof of injury to competition. Id.

50.  Finally, in order to recover monetary damages, a plaintiff must prove actual damages sustained by that plaintiff and proximately caused by the conduct of each of the defendants. Santana Products, 249 F. Supp.2d at 515-18.

**D.    Elements of Proof Required for a Claim Under Section 2 of Sherman Act**

51.  Section 2 of the Sherman Act, 15 U.S.C. § 2 ("Section 2"), states in pertinent part: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire

with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony."

52. Although Section 2 proscribes monopolization, attempted monopolization and conspiracy to monopolize, Santana alleged only a conspiracy to monopolize in its Complaint. See Count II of the Complaint at ¶75, Exh 5 hereto.

53. A claim of conspiracy to monopolize has three elements: "(1) the existence of a combination or conspiracy; (2) an overt act in furtherance of the conspiracy; and (3) specific intent to monopolize." Santana Products, 249 F. Supp. at 518.

54. In order to recover damages under the Clayton Act, a plaintiff must also prove actual injury caused by the conduct of each of the defendants. 15 U.S.C. §15. A plaintiff must also prove actual injury caused by the conduct of each of the defendants. See 15 U.S.C. § 15; Yeager's Fuel v. Pennsylvania Power & Light Co., 162 F.R.D. 471, 477 (E.D. Pa. 1995) ("An antitrust plaintiff seeking treble damages under § 4 of the Clayton Act must prove (a) an antitrust violation; (b) fact of damage; and (c) amount of damage. Fact of damage in this context requires proof of 'some' actual injury to the plaintiff's business or property caused by defendant's antitrust violation") (citations omitted).

### E.    Elements of Proof Required for a Claim Under Section 43(a) of the Lanham Act

55. In order to assert a claim for false advertising under Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), a plaintiff must prove that the defendant, "use[d] in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which

... in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities ...."

56. The plaintiff must prove that the commercial message is either literally false or, if not literally false, literally true or ambiguous with the tendency to deceive consumers. <u>Santana Products</u>, 401 F.3d at 136.

57. If the plaintiff proves literal falsity, there is no need to show that the buying public was misled. <u>Id.</u>

58. Otherwise, the plaintiff must prove "that there is actual deception or at least a tendency to deceive a substantial portion of the intended audience." <u>Id.</u>

59. Finally, in order to recover damages, a plaintiff must show that the "'falsification [or misrepresentation] actually deceives a portion of the buying public.'" <u>Santana Products</u>, 249 F. Supp.2d at 539-40 (citing <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.</u>, 898 F.2d 914, 922 (3d Cir. 1990)).

60. In order to obtain injunctive relief, a plaintiff must still establish "something more than a 'mere subjective belief that he is ... likely to be damaged,' but that the plaintiff 'need not quantify the losses actually borne.'" <u>Id.</u> at 542, n. 66 (citing <u>Warner-Lambert Co. v. Breathasure, Inc.</u>, 204 F.3d 87, 93 (3d Cir. 2000)).

**F.   Elements of Proof Required for a Claim of Tortious Interference With Prospective Contractual Relationships**

61. The tort of interference with prospective contract has four elements in Pennsylvania: "(1) a prospective contractual relation; (2) the purpose or intent to harm the plaintiff by preventing the relation from occurring; (3) the absence of privilege or justification on the part of the defendant; and (4) the occasioning of actual damage resulting from the defendant's

conduct." <u>Santana Products</u>, 249 F. Supp.2d at 543 (citing <u>Thompson Coal Co. v. Pike Coal Co.</u>, 488 Pa. 198, 208, 412 A.2d 466, 471 (Pa. 1979)).

 62. Under Pennsylvania law, a prospective contractual relation is something less than a contractual right, but something more than a mere hope.  <u>Id</u>.

 63. The plaintiff must establish a "reasonable probability" that it would have, in fact, obtained the contract in the absence of the interference, although it need not be "certain" that it would have obtained the contract.  <u>Id</u>.

### G. <u>The Allegations in the 1996 Litigation</u>

 64. Santana essentially alleged that all defendants conspired with members of the same Toilet Partition Manufacturers Council that Santana had sued and settled with in 1994 for the same conduct.  Santana alleged that all defendants, including Bobrick and Hornyak, used similar "fire scare tactics" to dissuade architects, specifiers and public officials from specifying or purchasing HDPE toilet partitions manufactured by plaintiff that caused harm to Santana.  <u>See generally</u> Santana's unverified Complaint at ¶¶ 25, 27, 45, 49, 53-65, Exh.5 hereto.  Specifically, Santana alleged that all defendants acted in furtherance of the antitrust conspiracy with the other members of the TPMC by:

> Showing a videotape prepared by Formica Corporation (the "Formica Videotape") to architects, specifiers, and public officials, which videotape allegedly misrepresented HDPE as being highly flammable, allegedly misrepresented toilet partitions as being interior wall finish under applicable building codes, and demonstrated a piece of HDPE burning, <u>see</u> Santana's Complaint, Exh. 5, ¶¶ 53-60;

> Showing a videotape prepared by Bobrick (the "Bobrick Videotape") which compared the burning characteristics of HDPE toilet partitions and solid phenolic toilet partitions manufactured by Bobrick and misrepresented the flame spread and smoke developed ratings for those materials as being applicable to toilet partitions, <u>see</u> Santana's Complaint, Exh. 5, ¶¶ 61-66;

Distributing Bobrick technical bulletin TB-73, which compared the flame spread and smoke developed ratings for phenolic and HDPE and suggested that HDPE was not suitable for buildings which require Class B fire ratings for interior wall finish, see Santana's Complaint, Exh. 5, ¶¶ 47, 51 and Exh. K thereto;

Distributing advertisements produced by Bobrick, which referred to HDPE toilet partitions as highly flammable and not suitable for buildings requiring a Class B fire rating for interior wall finish, see Plaintiff's Complaint, Exh. 5, ¶ 81; and

Conducting burning demonstrations of small samples of HDPE at meetings with architects, specifiers, and public officials (not alleged in Complaint but argued nonetheless in briefing).

65. The allegations made by Santana against Bobrick, Hornyak, and the other alleged two co-conspirators were in many cases identical (verbatim) to those Santana had made against the TPMC two years earlier. However, inexplicably, in the 1996 Complaint, Santana made no reference to the fact of the settled 1994 TPMC Litigation filed in the same court.

66. Subsequently, in its briefs in support of its motion for summary judgment on its Lanham Act claim, Santana argued (in an obvious attempt to obtain attorneys fees if successful) that the defendants had used "literally false" advertising. See Santana's Revised Memorandum in Support of Plaintiff's Motion for Summary Judgment of Defendants' Liability Under Section 43(a) of the Lanham Act, dated August 31, 2001 at 10-33; Santana Products, 249 F. Supp.2d at 525-39 (stating at 525: "Santana's Lanham Act claim depends on a finding that Bobrick's advertisements were literally false.... Santana does not attempt to argue that the offending advertisements were true but misleading, in which case Santana would be required to show that the targets of those advertisements -- the architects and specifiers -- were actually misled.").

67. In the 1996 Litigation, in addition to Bobrick and Hornyak, Santana named as defendants another independent Bobrick architectural representative Sylvester & Associates, Ltd., as well as the principal of Sylvester & Associates, Ltd., Frederick E. Sylvester, which sold Bobrick products in only portions of New York and northern New Jersey. Also named as a

defendant was Vogel Sales Company, another independent Bobrick architectural representative, which sold Bobrick products in only western Pennsylvania.

68.  On July 1, 1997, after the deposition of Frederick E. Sylvester, New York-based Sylvester & Associates, Ltd. and Frederick E. Sylvester moved to dismiss the Complaint against them for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2).

69.  On July 24, 1998, Chief Judge Vanaskie granted that motion and dismissed Sylvester & Associates, Ltd. and Frederick E. Sylvester for lack of personal jurisdiction. See Santana Products, Inc. v. Bobrick Washroom Equipment, Inc., 14 F. Supp. 2d 710 (M.D. Pa. 1998).

## H.    The New York Sylvester Litigation

70.  On October 30, 1998, Santana refiled the same substantive complaint in the United States District Court for the Eastern District of New York, but therein, named only Sylvester & Associates, Ltd. and Frederick E. Sylvester as defendants. See generally Santana Products, Inc. v. Sylvester & Associates, Ltd. and Frederick E. Sylvester, E.D.N.Y. No. 98-CV-6721.

71.  On December 29, 1999, the Honorable District Judge Jacob Mishler, assigned to that case, granted in part and denied in part a motion for judgment on the pleadings filed by Sylvester & Associates, Ltd. and Frederick E. Sylvester.

72.  Specifically, the late Judge Mishler granted the motion for partial judgment on the pleadings with regard to Santana's claim under Section 2 of the Sherman Act and, based on well-established authority, stated as to the inherent inadequacies of Santana's allegation that:

> <u>We find that Plaintiff has failed adequately to allege that</u>
> <u>Defendants' actions were aimed at monopolizing a portion of the</u>
> <u>toilet partition market in general and not merely at the elimination</u>
> <u>of plaintiff as a competitor.</u> Accordingly, Defendants' motion for
> partial judgment on the pleadings as to Plaintiff's section 2 claim is
> granted.
>
> * * *
>
> … <u>[U]nder the facts presented here, Plaintiff cannot assert a claim</u>
> <u>for conspiracy to form a shared monopoly under Section 2 of the</u>
> <u>Sherman Act.</u> Assuming Plaintiff's allegations are true, the result
> of Defendants' actions would be the elimination of Plaintiff as a
> competitor in the toilet partition market. <u>Plaintiff has not alleged,</u>
> <u>however, that competition among the many remaining</u>
> <u>manufacturers of toilet partitions would be diminished in any way.</u>
> Absent such an allegation, Plaintiff's conspiracy to monopolize
> claim must fail. Thus, as an alternative basis to the one mentioned
> above, Defendants' motion for partial judgment on the pleadings
> on Plaintiff's Section 2 conspiracy claim is granted.

<u>See</u> <u>Santana Products, Inc. v. Sylvester & Associates, Ltd. and Frederick E. Sylvester</u>, 121 F.

Supp. 2d 729, 1999 U.S. Dist. LEXIS 22550, *20, *24 (E.D.N.Y. 1999) (Mishler, J.) (emphasis

added), <u>reconsideration</u> <u>denied</u>, 2000 U.S. Dist. LEXIS 20213 (E.D.N.Y. Mar. 8, 2000) (Mishler,

J.), <u>leave to appeal denied for lack of jurisdiction</u>, slip op. (2d Cir. Nov. 15, 2000) ("The March 8

order [denying the motion for reconsideration] was not properly certified pursuant to § 1292(b)

for an interlocutory appeal and is not otherwise appealable as a final order or as an interlocutory

order falling within the collateral order doctrine…. With respect to the January 4 order [granting

the motion for partial judgment on the pleadings], <u>the petition for leave was not timely filed</u>

<u>within § 1292(b)'s ten day limitation period."</u>). (emphasis added).

## V.    <u>DISCOVERY IN THE 1996 LITIGATION</u>

73. Between March 3, 1997 and September 12, 2000, the parties in the 1996

Litigation engaged in exhaustive, burdensome and costly fact and expert discovery nationwide,

shepherded by Court-appointed Special Master George A. Reihner.

## A.    The Magnitude of Discovery

74. The parties in the 1996 Litigation mutually inspected well over a million pages of responsive documents, and eventually selected and exchanged nearly 500,000 pages of responsive documents (from the files of either the parties themselves or their architectural representatives) and more than two dozen videotapes, in addition to several extensive computer databases, produced on seven compact discs and approximately two dozen computer diskettes. In addition, subpoenas for documents were issued to over 270 third-party architects, specifiers, public schools, municipalities, authorities, suppliers, and testing laboratories nationwide resulting in the production of more than 500,000 pages of responsive documents. All the defendants to the 1994 TPMC Litigation, as well as numerous competitors, were also served with document subpoenas and their representatives were deposed. In response thereto, third parties produced more than 50,000 additional pages of responsive documents.

75. In the course of discovery, Hornyak and Bobrick produced thousands of pages of documents, in response to multiple sets of document requests, and answered dozens of interrogatories and requests for admissions.

76. In preparing its defenses, Hornyak and Bobrick were also required to serve numerous document requests and interrogatories on Santana to more fully understand their allegations. Santana generally resisted the production of documents and responding to interrogatories that sought, in particular, specificity concerning its alleged injury and damages. Costly proceedings ensued before Special Master Reihner and the Court to successfully obtain that basic information.

77. Overall, the parties in the 1996 Litigation deposed 181 witnesses, whose testimony filled more than 25,000 pages of transcripts. Specifically, between May 5, 1997 and

January 14, 2000, over 156 fact witnesses in 22 states were deposed, over the course of 178 days

of testimony, filling more than 20,800 pages of transcripts. On September 12, 2000, having

deposed 8 expert and 17 expert-related fact witnesses in the course of 31 days of actual

testimony, filling more than 4,700 pages of transcripts, the parties in the 1996 Litigation finally

completed expert discovery.

78. On April 23, 1999, Stephen Hornyak, the owner and principal of Hornyak, was

deposed at length by Santana's counsel.

79. Santana's counsel also deposed 12 current, former and retired employees of

Bobrick, as well as numerous other Bobrick independent architectural representatives nationwide.

### B.    Santana's Discovery Obfuscation

80. When asked in interrogatories to state all facts that supported its claim that

Hornyak had participated in a conspiracy, Santana was unable to identify a single supporting fact

beyond those in the Complaint and instead responded only as follows:

> Santana further objects to this interrogatory on the grounds that it
> is a premature contention interrogatory. Subject to all of its
> objections, see Santana's Complaint for a detailed statement of
> facts related to these contentions. Also see all documents provided
> to date and the names of all persons provided to date. <u>Without
> waiving its objections, pursuant to Rule 33, Santana will proffer
> additional documents.</u> Also, see responses to Bobrick's
> interrogatories.

<u>See</u> Santana's Response to First Set of Interrogatories to Plaintiff Propounded on Behalf of

Defendants, The Hornyak Group, Inc., Vogel Sales Company, Sylvester & Associates, Ltd. and

Frederick E. Sylvester, dated April 28, 1997, Exh. 6 hereto at 8, Response to Interrogatory 6.

(emphasis added). No such documents were ever forthcoming.

81. Similarly, when asked to identify allegedly lost jobs or allegedly lost potential

jobs caused to Santana by Hornyak or the alleged conspiracy of Defendants in detail, Santana

was again unable to proffer any detailed information establishing specific harm (and, indeed, objected to doing so), was likewise unable to provide any detail as to either the alleged conspiracy or Hornyak's involvement therein, and instead responded only as follows:

> Santana further objects to this interrogatory on the grounds that it is a premature contention interrogatory and that <u>Santana requires additional discovery from Bobrick and/or others before it can formulate its contentions as requested</u>. Subject to its objections, Santana has already produced production of document nos. B000001-669, which outlined the formation and operation of the conspiracy including Bobrick, Thrislington and others. The documents reveal their identity and the identity of persons and the respective communications made by the conspiracy and to whom they made them. Furthermore, according to the damage law applicable to both the antitrust and the false advertising counts, <u>Santana objects to identifying particularized cases of damage beyond those required by the case law applicable in the Third Circuit</u>. Subject to all of its objections, Santana will proffer business records regarding lost jobs and/or contracts.

<u>See</u> Santana's Response to First Set of Interrogatories to Plaintiff Propounded on Behalf of Defendants, The Hornyak Group, Inc., Vogel Sales Company, Sylvester & Associates, Ltd. and Frederick E. Sylvester, dated April 28, 1997, Exh. 6 hereto at 9, Response to Interrogatory 8 (emphasis added). No such documents were ever forthcoming.

82. Similarly, when asked in interrogatories to state all facts that support its claim that Bobrick had participated in a conspiracy, Santana initially provided an inadequate response that failed to sufficiently identify such facts. <u>See</u> Plaintiff Santana Products Inc.'s Response to Bobrick's First Set of Interrogatories Nos. 1-25, dated April 3, 1997, at pp.14-15, Exh. 7 hereto.

83. Eventually Santana, after being ordered to do so by Special Master Reihner, finally identified allegedly lost jobs caused to Plaintiff by Bobrick and Hornyak. Based on good faith reliance on Santana's so-called Lost Jobs List, Bobrick subpoenaed documents and scheduled depositions of more than 100 party and known third-party witnesses nationwide to challenge the bona fides of Santana's allegations.

84.  However, at the conclusion of that costly and contentious discovery process, the evidence was clear that the vast majority of the jobs Santana listed as "lost jobs" were, in fact public jobs.  At best, only five jobs appeared to be private jobs, but there was no proof of any damages to Santana related to any of those jobs caused by defendants.  This raised serious questions as to whether an adequate investigation had been done prior to the Complaint being filed.

85.  Moreover, any petitioning activity by defendants concerning the public jobs was clearly protected under the <u>Noerr-Pennington</u> doctrine based on well-established authority.

**C.    <u>Discovery Established that Santana Had No Basis in Fact or Law to Initiate or Continue to Prosecute Its Claims Against Hornyak or Bobrick in the 1996 Litigation</u>**

86.  Discovery confirmed that Santana had no basis in fact or law for initiating or continuing to prosecute its claims against Hornyak or Bobrick.

87.  Discovery revealed that Santana itself conducted no pre-complaint investigation into the facts giving rise to a possible claim against Bobrick or Hornyak before commencing the 1996 Litigation, naming Bobrick and Hornyak as defendants.

88.  For example, Defendant Lynch, Sr., Santana's President, testified that while he authorized the filing of the Complaint, he only "quickly" reviewed the Complaint before it was filed:

> Q.    You said yesterday that you authorized the filing of this complaint, is that right?
>
> A.    Yes.
>
> Q.    And you reviewed it before it was filed, is that right?
>
> A.    What do you mean by review?
>
> Q.    Read it.

> A.    Briefly, yes, I didn't spend a whole lot of time on it.
>
> Q.    But you read it, though?
>
> A.    Quickly.
>
> Q.    What was the hurry?  Why did you read it quickly?
>
> A.    I didn't spend a lot of time on it.

See Lynch, Sr. 1/12/00 Dep. at 278-279, Exh. 8 hereto.

89. Moreover, Lynch, Sr. further testified that he could not recall the details of the investigation into the facts giving rise to the 1996 Litigation:

> Q.    Well, who would know that, as to what investigation they undertook?
>
> A.    Who would know what investigation they took?
>
> Q.    Yes, who knows about the investigation?
>
> A.    I would say [Santana counsel] Bill [Jackson] and Jerry [Butler], maybe [Santana General Manager] John Carney.
>
> Q.    Well, I asked Mr. Carney and he wasn't aware of any investigation so --
>
> A.    All right.
>
> Q.    So if I wanted to ask somebody about that investigation --
>
> A.    When you say investigation, do you mean going through records and --
>
> Q.    Sure, yeah, what lawyers normally do, interview people and look at records to determine whether they have a basis for doing something before they blast off a lawsuit.  What investigation did your two lawyers undertake before they filed this very serious lawsuit?
>
> A.    A lot.
>
> Q.    How do you know that?
>
> A.    Their bills were very big.
>
> Q.    Okay.  That sometimes is a criteria.

A.    Okay, lots of investigation, you know.

Q.    All right. Well, let me ask you; did they tell you what they did? Did they tell what you their investigation was when they sent you those big bills?

A.    We had talks about it, but nothing -- nothing that I can recall at this moment.

Q.    Okay. Well, did they tell you what they had done?

A.    Yeah.

Q.    What did they say?

A.    I don't know. I can't remember.

Q.    So if I wanted to know --

A.    It was a subject of a conversation, what actually transpired in the conversation word for word, I do not remember.

Q.    Do you remember anything generally about the conversation?

A.    The reasons for why they were in the suit were explained to me.

Q.    Yes.

A.    And I agreed with the explanation. Can I verbatim give you the explanation, no.

Q.    Can you give me an explanation generally, in any way?

A.    No, there was too much -- just too much stuff going on.

Q.    Any aspect of the conversation you can remember?

A.    That they showed the fire film, I remember that.

Q.    Who showed the fire film?

A.    I'm not positive, I'm confused between the two of them Vogel Sales Company and The Hornyak Group]. But the subject was discussed by them, I just can't bring that back.

Mr. Lynch was further questioned on this alleged investigation by counsel:

Q.     So if I wanted to know what your lawyers did to investigate the filing of this lawsuit, are you telling me the only way I can find that out is to ask your lawyers that?

A.     They went through all the records. They went through everything that was possible. They went through all the depositions. They went through all the discovery they could get. They went through everything they could find.

Q.     But only they know that, don't they?

A.     <u>No, and when they found stuff that was discussed.</u>

Q.     But you can't remember that?

A.     <u>You're asking me about one outfit here in a massive thing. No, I don't know the specific specifics, but I do know I was -- that was discussed on them being in this lawsuit and why they were in it. And when they were finished explaining it to me, and so forth and so on, I -- absolutely.</u>

Q.     But you don't remember the conversations?

A.     I remember that they showed the film. I remember -- and that's enough for me.

Q.     But you don't remember who showed the film?

A.     Which one of the two companies?

Q.     Yes.

A.     <u>No, because I was -- I kept on calling the Hornyak the "Yak" group, and I never was -- because I never met these people, I don't know who they are actually.</u>

Q.     Right.

A.     <u>So it was discussed, and I agreed.</u>

Q.     Yeah, but you don't remember the discussions, though, that's the problem.

A.     That they showed the -- that they did show the films to public schools systems in the state of Pennsylvania, and they did do that.

Q.     Who --

> A.    And that was having us misclassified.
>
> Q.    Who showed the films to whom?
>
> A.    <u>I'm not sure of that, which one did which.</u>

See Lynch, Sr. 1/12/00 Dep. at 284-291, Exh. 8 hereto (emphasis added). See also Transcript of Hearing before Special Master George Reihner, dated July 14, 1998 at 25-26, Exh. 9 hereto (Lynch testifying that he personally decided to retain Larson & Taylor to represent Santana in this case and only generally reviewed Santana's Complaint in this matter before it was filed).

90. As another example of the lack of an adequate investigation before the Complaint was filed, Santana contended that a slide depicting a HDPE toilet partition burning was used in some Bobrick box lunch presentations to architectural firms and that it was misleading.

91. However, in the costly discovery thereafter, not one word of testimony was adduced by Santana as to which architectural firms were purportedly presented with the box lunch presentation with the offensive slide, or, more importantly, whether any of these firms were actually influenced to specify solid phenolic toilet partitions or not to specify HDPE toilet partitions, as a result of seeing the singular slide.

92. Nor did discovery reveal any facts which supported the requisite elements for Santana's claims for a violation of the Sherman Act, Lanham Act or tortious interference with prospective advantage by Hornyak, or supported Santana's claims for violations of the Sherman Act or tortious interference with prospective advantage by Bobrick. At most, discovery only supported an arguable claim for injunctive relief (not damages) against Bobrick for violations of the Lanham Act as to five private jobs, if not barred by the doctrine of laches.

**(i)    Discovery as to Hornyak Revealed the Baseless Nature of Santana's Claims**

93.   Hornyak's protected individual petitioning of public entities had no impact on Santana's sales and there was no evidence in the massive record to the contrary.  Nor was there any evidence revealed as to any petitioning of private entities by Hornyak.

94.   Santana was unable to identify in years of costly discovery any injury to either Santana or to competition generally caused by the individual actions of Hornyak.

95.   Discovery confirmed that Hornyak served as an independant architectural representative of Bobrick in only eastern Pennsylvania, southern New Jersey and the State of Delaware.

96.   As an architectural representative, Hornyak visited potential customers, including architectural firms, in its territory, to promote Bobrick's washroom accessories and toilet partitions.

97.   Hornyak did not know that the Toilet Partition Manufacturers Council ("TPMC") existed until this litigation began. See Hornyak Dep, at 171-73, Exh. 1 hereto ("Never."), and at 225-26 ("I never knew they existed."). Moreover, Bobrick did not even inform Hornyak that Bobrick had been asked to join the TPMC, but declined to do so. See Hornyak Dep. at 171-72, Exh. 1 hereto("I'm pretty far down the food chain here, you know?"). Finally, Hornyak was not even aware that there was a prior litigation in which Santana sued members of the TPMC and Formica. See Hornyak Dep. at 225, Exh. 1 hereto.  Santana never proved otherwise.

98.   Stephen Hornyak testified that he provided a copy of Bobrick's TB-73 at issue to only three entities: the Philadelphia School District, the Colonial School District, and the State of Delaware, Department of Parks and Recreation. See Hornyak Dep. at 154-55, Exh. 1 hereto ("Q. Was it all three or just some of the three? A. All three of them, I would say. Q. Were there any others

beyond those three that you can remember today you provided TB-73 to? A. No, not that I can recall. ").

99.    During four years of burdensome discovery, Santana did not depose or obtain an affidavit from a single representative of either the Colonial School District or the State of Delaware, Department of Parks and Recreation, to prove its allegation that Hornyak's alleged conduct as to these entities caused Santana to be injured in any way.

100.    Mr. Hornyak further testified that all three potential customers identified by Santana actually purchased Santana's not Bobrick's product, despite having seen TB-73, and continued to purchase Santana's product thereafter. See Hornyak Dep. at 40, Exh. 1 hereto ("Unfortunately, until today, until 1999, as far as I know, Philadelphia School District, Parks and Rec and Colonial School District is using Santana material."), at 42 ("It seems funny. I mean Santana is kicking my a- - [sic] all over the state, from north to south, right through the State of Delaware with their product and it seems funny being here, you know, when I'm the one that's getting beat up. But I'm here..."), at 118 ("They ended up getting the job."), and at 232-33 ("Santana stayed as the approved substitution. They ended up getting the work and still have it till today."). See also Letter of School District of Philadelphia Administrator Albert M. Dorsey to Greg Borgia, of Santana, dated July 12, 1995, Exh. 10 hereto ("We have installed Santana partitions throughout our school district for the past three years."). Santana never presented any proof to the contrary.

101.    Indeed, David Sonnenthal, the former Chief Architect for the Philadelphia School District, testified that he had no recollection of ever having seen Bobrick's TB-73. See Sonnenthal 1/14/00 Dep. at 26, Exh. 11 hereto ("Q. ... Do you have any recollection of a Bobrick employee or representative showing you a document stating that HDPE would burn? A. No. Q. How about a document - do you have any recollection of a Bobrick employee or representative

showing you a document comparing HDPE -- A. No, no. Q. Hold on. –to phenolic or any other material to be used in toilet partitions? A. No."), and at 66 ("Q. Could you review that document [TB-73] and tell me if you've ever seen it before? A. No. This is solid phenolic paneling, which we didn't use at the time.") and at 90 ("Q. And just to be clear, you've never seen [TB-73] before Ms. Poteate showed it to you today? A. No. No, I don't remember that. Q. So that was not included in the materials you -- A. No. Q. -- ever received? A. No. We received standard manufacturer's literature."). Santana did not establish otherwise.

102. Mr. Hornyak testified that he showed the Formica Videotape to the Colonial School District in New Castle, Delaware. See Hornyak Dep. at 21-22, 33-36, Exh. 1 hereto. However, as set forth above, it was undisputed that the Colonial School District used Santana's and not Bobrick's products. See Hornyak Dep. at 40-42, Exh. 1 hereto. Santana never offered any proof to the contrary.

103. Mr. Sonnenthal, the former Chief Architect for the Philadelphia School District, testified that he had no recollection of ever having seen the Formica Videotape. See Sonnenthal Dep. at 26-27, Exh. 11 hereto ("Q. Okay. Do you have any recollection of a Bobrick employee or representative showing you a videotape relating to the flammability of HDPE? A. No. Q. Do you have a recollection of a Bobrick employee or representative showing you a videotape relating to anything? A. No recollection."), and at 72-73 ("Q. Do you recall ever hearing about a videotape being shown that related to the flammability of toilet partitions? A. No. Q. And it is correct to say that you never saw a video yourself? A. No, I did not. Q. If I showed you a video, would it bring back a memory, or are you certain that you never saw one? A. I'm certain it was never shown. Because as I tried to state before, we developed our own specifications. We didn't -- you know, we didn't go in for sales presentations, such as videotapes or things of that nature. Besides, I think that

came in the late '80s, early '90s, that kind of approach by salespeople. Before that, you didn't have it.
Q. What do you mean by that kind of approach? A. Well, of showing videotapes. Videotapes
didn't come into use in the mid '80s -- early to mid '80s. Maybe in the early '90s, but I retired by
then."). Santana never proved otherwise.

104. Mr. Hornyak testified that he considered showing the Formica Videotape to the
State of Delaware, Department of Parks and Recreation, but did not because it lacked a television
or video cassette recorder on which he might play it. See Hornyak Dep. at 22-23, Exh. 1 hereto.
Again, the Delaware Parks and Recreation Department purchased and continued to purchase
Santana toilet partitions. See Hornyak Dep. at 117-18, 231-33, Exh. 1 hereto. There was no proof
to the contrary after more than four years of burdensome litigation.

105. As to the Bobrick Videotape, Hornyak never used it. See Hornyak Dep. at 32,
Exh. 1 hereto ("A. We never used the Bobrick tape. Q. You did not? A. No."). Santana never
offered any proof that he did.

106. As set forth above, Mr. Sonnenthal, of the Philadelphia School District, had no
recollection of ever having seen any videotape related to toilet partitions. See Sonnenthal Dep. at 26-
27, 72-73, Exh. 11 thereto.

107. Hornyak testified that on one occasion either he or Bobrick Architectural Sales
Manager Robert Gillis conducted a burning demonstration at Delaware Parks and Recreation
Department in 1989. Hornyak Dep. at 117, 208-10, Exh. 1 hereto. However, he further testified
that Santana, not Bobrick, was awarded the work. Hornyak Dep. at 118, Exh. 1 hereto ("Q. And
actually what you did, in demonstrating that, did not lead to keeping Santana from being used as a
substitution? A. No. Q. Is that correct? A. That is correct. They ended up getting the job.") and
at 232-33 ("Santana stayed as the approved substitution. They ended up getting the work and still

have it till today."). Santana never deposed anyone from the Delaware Parks and Recreation Department to show otherwise.

108.   Mr. Sonnenthal, of the Philadelphia School District, was not even asked by Santana's counsel whether he had seen a burning demonstration conducted by Hornyak or any Bobrick sales representative. In fact, he testified that he attempted to burn a sample of toilet partition on his own, but stated that neither Hornyak nor any other Bobrick architectural sales representative urged or even suggested that he do so:

> A.... I kept some wooden matches in my desk, and I lit one, maybe two, under it. And it started to melt at the point where the flame touched the material
>
> Q. How long did you have the flame in contact with the material?
>
> A. I think as long as the match lasted before it burned my fingers.
>
> Q. Okay. And in that time it started to melt?
>
> A. It started to melt, yes.
>
> Q. Do you recall whether there was any smoke given off?
>
> A. There may have been. I'm not certain.
>
> * * *
>
> Q.... Did anyone from Bobrick suggest -- and by that I mean, did any Bobrick employee or representative suggest that you conduct this test?
>
> A. No.
>
> Q. Was this -- where did you get the idea to do this test?
>
> A. Well, I'm an architect. I look at things. And you have to understand, we didn't just -- this is typical for most products. I don't just call someone in and say I want yours. We look at things very carefully. We review them. We conduct our own tests before we even call a salesman in. Before we even decide to accept a product, we make up our own mind. At least that was my approach.

Sonnenthal Dep. at 29, 32, Exh. 11 hereto; see generally id. at 28-33, 36-41, 43-44, 59-64, 73, Exh. 11 hereto.

109.  Hornyak conducted some box lunch presentations, during which some slides were shown. Hornyak Dep. at 108-09, 147-49, Exh. 1 hereto. During these presentations, Hornyak showed one slide depicting a burning toilet partition. Hornyak Dep. at 149-50, Exh. 1 hereto. Mr. Hornyak did not testify that the slide had any impact, and he was not asked a single question regarding its impact by Santana's counsel.  Hornyak Dep. at 149-52, Exh. 1 hereto.  Santana never offered any proof that Hornyak's use of the box lunch presentations caused it to lose any specific jobs or that Hornyak used the specific burning slide at issue in his box lunch presentations.

110.  Indeed, Mr. Sonnenthal, of the Philadelphia School District, testified that he had no recollection of ever having seen a slide depicting a burning toilet partition. See Sonnenthal Dep. at 73-74, Exh. 11 hereto  ("Q.  Did you ever see any slides or photographs depicting a burned toilet partition? A.  No, no.  Q. Did you ever hear about such a slide being shown?  A.  No, I did not.")

111.  Hornyak received, but never distributed or mailed, reprints  of  the  American School  &  University  Magazine advertisements at issue. Hornyak Dep. at 152-54, 156-57, Exh. 1 hereto.  Mr. Sonnenthal, of the Philadelphia School District, was not asked by Santana's counsel whether he recalled having seen such an advertisement.

112.  Santana's damages expert, John Pisarkiewicz,  took detailed handwritten notes of his meetings with various Santana employees and lawyers, to formulate his opinion, but admitted therein the lack of impact of the alleged conspiracy on Santana in Pennsylvania, which included Hornyak's sales territory.   As the following notes made clear:

> PA influenced by Harrisburg - we got in early to the State people - consequently it was difficult for the conspiracy to have an impact...in Western Pa - Bobrick ran into a stone wall PA  - shows how well we could do w/o the impediment imposed by the conspirators

See Documents Bearing Bates Labels B 165783 - B 165784, attached as Exh. 12 hereto (emphasis added); See also Pisarkiewicz 8/8/00 Dep. at 437, Exh. 13 hereto.

     113.  Dr. Pisarkiewicz further explained his notes as follows:

[Mr. Hittinger] Q:.... Can you read that?

[Dr. Pisarkiewicz]
A: Influenced by Harrisburg. We got in early to the state people, consequently is difficult for the conspiracy to have an impact.

Q:  Can you explain that to me?

A: This is apparently what [Santana's National Sales Manager Patrick McGartland] Mr. McGartland is telling me about -- he's saying that in Pennsylvania, that the government bodies buying this kind of product, that Santana was successful in convincing the state people that Class A was not a requirement or wasn't necessary.

Q: Okay. And you mean by Pennsylvania, both eastern and western Pennsylvania?

A: Well, this doesn't distinguish?

Q: Did you distinguish?

A: No. Although I can recall we've looked at earlier today some notes that talked about eastern Pennsylvania as a strong area for Santana.

Q: And did you understand Mr. McGartland was telling you that western Pennsylvania was also strong for Santana?

A: What I understand him to be saying is that the entire state or the government, governmental bodies within the state, which I suppose would include quasi government bodies like school boards, were influenced by decisions made in Harrisburg, which is the state capital.

Q: Do you know if Santana's sales in Pennsylvania dropped at all?

A: I don't know.

Q: Based on this note, if they had dropped, would that be attributable to something other than the conspiracy, like price or delivery or service?

A: Well --

Q: If it had dropped at all?

A: If it had dropped. Presumably, unless the market had tanked for some reason or another.

Q: Do you know where Bobrick representative ... Vogel does business?

A: I don't recall.

Q: Did you ever discuss with anyone from Santana why Santana sued Mr. Vogel, Mr. Hornyak? Or it never came up?

A: I think Santana views them as co-conspirators along with Bobrick.

Q: But you never discussed the specifics of what they did; did you?

A.: No.

Dr. Pisarkiewicz further testified:

A: [reading his notes:] "In Western Pennsylvania, Bobrick ran into a stone wall."

Q: Can you explain that?

A: That was Mr. Garvin's [McGartland's] perception.  As I understand it, he's from Pittsburgh or had his office based in Pittsburgh.

Q: So, he would know what he's talking about?

A: Presumably.

Q: Could you read the next one?

A: "PA" -- that would be Pennsylvania, "shows how well we could without the impediments imposed by the conspirators."

Q: What do you mean by that?

A: Well, it was Mr. McGartland's assessment apparently that <u>the conspiracy did not have an impact in Pennsylvania and that Santana was able to perform as it had before.</u>

Q: So, Pennsylvania was a success story of sorts?

A: <u>Well, it was a - according to [Santana's] Mr. McGartland, it was a -- it's a story of -- that there would be little or no impact in the conspiracy in Pennsylvania.</u>

Pisarkiewicz 9/6/00 Dep. at 813-17, Exh. 14 hereto (emphasis added).

114.  Dr. Pisarkiewicz also made notes of a conversation with Santana's counsel,

Defendant William E. Jackson, Esquire, in which they discussed using the success story of

Pennsylvania as a point of comparison for an alleged impacted area, such as Florida.  <u>See</u>

Document Bearing Bates Label B 165770, Exh. 12 hereto; <u>see also</u> Pisarkiewicz 9/6/00 Dep. at 747-51, Exh. 14 hereto ("Q. What was the purpose of making that comparison? A. Well, <u>apparently eastern Pennsylvania was doing well.</u> It's not clear about New York State. Apparently that wasn't doing well but wanted to take New York City out because of the fire rate issue. <u>That would be my interpretation of it as I look at it right now.</u> Q: What would that hopefully tell you by doing that comparison? A: Well, if you could do that comparison, presumably you would see some differences that Santana would have been stronger and if it's possible to get a -- I don't know exactly how that would have been done, if there would have been some kind of market share for eastern Pennsylvania. I mean if you had perfect data, maybe you could do something like that. <u>Q: So, the idea was to look at a successful region and compare it to an unsuccessful region and see the difference? A: Exactly.</u> Q: But you couldn't do that? A: No. <u>Q: Do you know where Mr. Hornyak, a Bobrick rep does business? A: I think he may be New York but I'm not certain.</u>") (emphasis added).

115. Santana's General Manager John Carney also testified that Santana named Hornyak as a defendant solely on the basis of advice of counsel, and that counsel advised that they had reason to believe that Hornyak had shown a misleading videotape, but they did not give any specifics:

> Q.    And I was wondering if you know who made that decision at Santana to name Hornyak -- the Hornyak Group and Vogel Sales Company as Defendants in this lawsuit?
>
> A.    <u>This was made on the advice from counsel, the decision to sue those, Hornyak and Vogel.</u>
>
> Q.    Did your counsel tell you why they should be sued?
>
> A.    They -- we had reason to believe or it was suggested to me that there is reason to believe that they were -- they used the -- the -- I think the Bobrick, what we -- a film indicating burning of --

of some high-density polyethylene and that there may -- may be
either reasons that -- that I can't recall right -- specific reasons why
we thought that they perpetuated part of the conspiracy.

Q.    When did you have -- when were you advised of this
information, before the Complaint was filed?

A.    There was discussion as to reasons to include them, so that
would be prior to the filing of the suit.

Q.    What specific information were you given?

A.    I don't recall any specific information, just that -- that there
was reason to believe that they participated in the -- in the -- the
allegations that we included in the -- in the suit.

Q.    And your counsel told you this?

A.    This was -- the suit was developed by counsel.

See Carney 12/15/99 Dep. at 299-301, Exh. 15 hereto (emphasis added).

116. Similarly, Santana's Chief Financial Officer James Gavigan testified:

Q.    ... Considering the statements that are in
Dr. Pisarkiewicz's notes, do you know why Santana chose to sue
Hornyak and Vogel if the conspiracy didn't seem to have much of
an impact in Pennsylvania?

MR. JACKSON: Objection as to form, argumentative.

THE WITNESS: Yeah. No, I don't know.

BY MR. WIEAND:

Q.    Did you ever have any discussion with anyone else at
Santana as to why Hornyak and Vogel were named as Defendants?

A.    I don't recall the discussions.  I'm sure we had them, but I
don't recall them right now.

See Gavigan 9/11/00 Dep. at 50-51, Exh.16 hereto (emphasis added).

117. Despite four years of costly discovery, including over 200 depositions and the

parties' production of approximately 500,000 pages of responsive documents, Santana only

claimed three "allegedly interfered with" jobs in Hornyak's entire geographic territory and, as

noted above, Santana retained the business on all three jobs.  See Plaintiff's Third Supplemental Response to Bobrick's First Set of Interrogatories, dated October 6, 1999, at Appendix D, attached as Exh. 17 hereto.

118.  Discovery, costing millions of dollars, did not reveal any facts to support any of Santana's three claims against Hornyak yet Santana continued to pursue these baseless and meritless claims before the District Court and on appeal to the Third Circuit and the Supreme Court.

**(ii)  Discovery as to Bobrick Revealed the Baseless Nature of Santana's Claims**

119.  Similarly, after massively burdensome discovery, Santana adduced no factual support for its antitrust or tortious interference claims against Bobrick.

120.  John Carney, Santana's General Manager and the employee identified as its liaison with counsel in this case, testified that he "can't point to anything" that led Santana to think Bobrick had engaged in any improper conduct.  See Carney 12/15/99 Dep. at 12, Exh. 15 hereto.  When asked what he knew about Bobrick's conduct at the time Santana filed its Complaint herein, Mr. Carney responded, "I didn't know – I didn't know anything specific at the time."  Id. at 13.

121.  Similarly, when asked this same line of questions, Santana's Chief Financial Officer James Gavigan, who has also served as liaison with counsel in this case, testified as follows:

> A:    Information came to our attention that – that Bobrick may have been involved in some activities that were in violation of – of certain laws.
>
> Q:    Who provided that information?

A:    I don't recall specifically who provided it. It was just discovery that – that arose during the Formica case.

Q:    Well, the Formica case [the 1994 TPMC Litigation] was settled soon after it was brought, so what discovery are you talking about?

A:    To the best of my knowledge, that's when it – information came to our attention.

Q:    All right. What information?

A:    <u>I don't recall the specific instances</u>.

Q:    Who was involved in obtaining that discovery?

A:    Our attorneys.

Q:    What about anyone at Santana?

A:    I don't recall.

Q:    Were you?

A:    No.

Gavigan 1/6/00 Dep. at 7-8, Exh. 4 hereto. (emphasis added). <u>See also</u> 1/11/00 Deposition of Lynch, Sr. at 48-50, Exh. 18 hereto ("Q: Mr. Carney testified that he did not provide any information to your counsel between '94 and '96 concerning Bobrick; do you disagree with that testimony? A: No. Q: Mr. Gavigan gave the same testimony; do you disagree with that testimony? A: No. Q: Did you provide any information to your counsel between '94 and '96 concerning Bobrick? A: I am not sure. Q: So is what you are telling me that the Bobrick lawsuit was based upon information that your counsel developed, it was not based upon information that was provided to your counsel by anybody at Santana? Is that what you are saying? ... THE WITNESS: I think so, yes.") (objections and colloquy between counsel omitted).

122. The vast array of the architects, specificers and public officials that Bobrick was forced to depose testified that they never saw any materials raising the flammability issue and were not influenced by anything done or said by any of the alleged co-conspirators, including Bobrick.

123. For example, out of 53 architects and public officials who were located and deposed, only 4 said they recalled even seeing TB-73, and three said they were not influenced by TB-73.

124. Santana claimed the alleged conspirators, including Bobrick, caused Santana to lose a job in the Pittsburgh public schools, i.e., from the City of Pittsburgh Board of Education, and that defendants "interfered with" Santana's efforts to get its product specified and placed in Three Rivers Stadium, the professional sports stadium owned by the City of Pittsburgh and leased to the Pittsburgh Pirates and Steelers. See Plaintiff's Third Supplemental Response to Bobrick's First Set of Interrogatories, dated October 6, 1999, at Appendix D, under the heading "Pennsylvania," Exh. 17 hereto.

125. Donald Thomas of Vogel Sales testified that he and Bobrick's then Eastern Regional Sales Manager Jim Loden made a sales call to the chief architect of the City of Pittsburgh Board of Education, and his assistant in approximately 1991. See Thomas Dep. at 20-21, Exh. 19 hereto.

126. Thomas testified that during the meeting, "someone" attempted to burn small samples of both HDPE and solid phenolic, though Thomas could not remember who attempted to burn the samples. See Thomas Dep. at 20, 45, 51-52, Exh. 19 hereto.

127. Thomas further testified that the generic HDPE sample burned, but the phenolic sample did not. See Thomas Dep. at 51-52, Exh. 19 hereto.

128. Significantly, Thomas testified that despite the burning demonstration, the Pittsburgh School Board has continued to specify HDPE (not phenolic) toilet partitions since 1991. See Thomas Dep. at 52, Exh. 19 hereto.

129. Similarly, Santana's own sales representative in western Pennsylvania, Ms. Lori Rhoades, testified that "as a general rule" the Pittsburgh School Board specifies HDPE toilet partitions. See Rhoades Dep. at. 62-63, Exh. 20 hereto.

130. Indeed, Santana's own representative Ms. Rhoades testified that she was not aware of a single instance in which the Pittsburgh School Board did not specify HDPE toilet partition because of the flammability issue, despite Santana's allegations to the contrary. See Rhoades Dep. at 63, Exh 20 hereto.

131. As another example, Santana alleged that Bobrick, among others, interfered with Santana's efforts to get its product specified and placed in Three Rivers Stadium, the professional sports stadium owned by the City of Pittsburgh. See Plaintiff's Third Supplemental Response to Bobrick's First Set of Interrogatories, dated October 6, 1999, at Appendix D, Attachment E, under the heading "Pennsylvania," Exh. 17 hereto.

132. In support thereof, Santana cited an April 30, 1991 Memorandum authored by Bobrick's James Loden, Exh. 21 hereto. Therein, Mr. Loden simply states that stadium officials, after viewing the Bobrick Videotape by Bobrick representative Jim Farnan, were "now leaning toward [Bobrick's] solid phenolic." See Exh. 21 hereto at 2 (emphasis added).

133. However, Santana's own Ms. Rhoades further testified that flammability was not an issue in either of the two renovations jobs at Three Rivers Stadium. See Rhoades Dep. at 63-65, Exh. 20 hereto.

134.  She testified further that with regard to the more recent job for Three Rivers Stadium, Santana (not Bobrick) was awarded the job. See Rhoades Dep. at 64, Exh. 20 hereto; see also Vogel Dep. at 239-40, Exh. 22 hereto.  Santana never offered any proof to the contrary.

135.  Mr. Vogel testified that as of the date of his deposition, Bobrick had not provided any toilet partitions to the Three Rivers Stadium. See Vogel Dep. at 240, Exh. 22 hereto.  Santana never showed otherwise.

136.  Architect Nicholas Kampo, of McLaughlin Cornelius & Feloni, identified by Santana, testified as follows:

> Q.    And do you know if at any time Mr. Vogel ever showed you a videotape which depicted a piece of polyethylene that was burning?
>
> A.    No.
>
> Q.    And do you ever recall seeing a videotape which showed basically a side-by-side comparison of a phenolic toilet compartment and a polyethylene toilet compartment where a roll of toilet paper was lit and placed underneath the toilet compartments?
>
> A.    No.
>
> Q.    Do you know if --- do you have any recollection of Mr. Vogel ever showing you any type of videotape?
>
> A.    No.

Kampo Dep. at 15-16, Exh. 23 hereto (emphasis added).

137.  Similarly, Mr. Vogel testified:

> Q.    Are you familiar with the Pittsburgh area architectural firm by the name of McLaughlin Cornelius?
>
> A.    Yes.
>
> Q.    Who are they, please?
>
> A.    They are an architectural firm in Pittsburgh.

Q.     And from time to time, do you or any of your employees call on them to update their Bobrick material?

A.     Yes.

Q.     And as you sit here today, <u>do you have any information about whether anyone on behalf of Vogel or Bobrick has shown any videotape of burning of a high density toilet compartment to people like McLaughlin Cornelius</u>?

A.     <u>We've not</u>.

Q.     Are you saying you know that it has not been done or you don't recall it?

A.     <u>I know that we have not</u>.

Vogel Dep. at 235-36, Exh. 22 hereto (emphasis added).  Santana never proved otherwise.

138.  As previously discussed, in the 1996 litigation, Santana was asked to identify the damages incurred due to Bobrick's alleged conduct.  Initially, Santana refused to do so and the issue was brought to the Special Master's and the Court's attention.  Lengthy expensive battles ensued regarding the parties' right to know the damages being claimed by Santana.  The Special Master and Court agreed with Bobrick and required Santana to produce a list of its lost jobs, referred to as the Lost Jobs List.

139.  Bobrick began investigating the jobs on Santana's Lost Jobs List by taking depositions nationwide at great expense.  Bobrick subpoenaed documents and scheduled depositions of more than 100 party and third-party witnesses.  After a costly investigation, Bobrick discovered that most, if not all, of the claims of lost jobs were unrelated to any of the allegedly conspiratorial activity of Bobrick or the TPMC members.

140.  Specifically, the voluminous testimony of the many witnesses over four years of discovery fell into three categories.  First, many of the architects, specifiers and public officials said they had never received or reviewed any information from Bobrick, its architectural

representatives or the TPMC members concerning the flammability of the HDPE toilet partitions and, therefore, were not influenced by any such information. Second, some architects, specifiers or public officials said they had received such information, but they were not influenced by it. In many cases, they continued to specify Santana's HDPE toilet partitions, not Bobrick's product. Third, in several isolated situations, the architect or customer received information concerning the flammability of HDPE toilet partitions from a Bobrick representative or some other source. However, after receiving this information, the architect or customer then conducted his or her own investigation or test, which led that person to either choose phenolic toilet partitions rather than HDPE toilet partitions or to insert a fire rating into its toilet partition specifications. Taken as a whole, the exhaustive and costly discovery failed after four years to support Santana's claims of a systematic unlawful unreasonable restraint of trade or significant harm to Santana, as it had alleged in its Complaint.

141. As Bobrick eventually stated in its summary judgment motion, "Bobrick's use of the Formica Videotape was limited in both its distribution and impact. Of the 53 architects, specifiers, and public officials deposed in this case in connection with Santana's represented Lost Jobs List, 37 testified that they could not recall ever having seen the Formica videotape, 3 heard a "videotape" was shown but did not see it themselves, 4 saw a "videotape" depicting HDPE burning but did not identify the Formica Videotape as that videotape, 6 were not asked whether they had seen the Formica Videotape, and 3 said they only viewed a portion of it". See Defendants Bobrick Washroom Equipment, Inc. and The Bobrick Corporation's Statement of Undisputed Facts, dated October 19, 2001, at 66-67.

142. Further, at the end of that costly and extensive discovery process, the evidence made it clear that the vast majority of the jobs Santana listed as "lost jobs" were, in fact, public

jobs. The claims related to those jobs, which were public jobs, were barred by the well-established Noerr-Pennington doctrine. Only five jobs, at most, appeared to be private jobs and were not barred by the Noerr-Pennington doctrine. However, as to those five jobs, there was no proof of any damages related to any alleged conduct of Bobrick or Hornyak.

143. Additional discovery confirmed that Santana had no basis in fact for initiating or continuing to prosecute its antitrust or state law claims against Bobrick

144. Defendant Gavigan testified that the decision to initiate the underlying litigation against Bobrick was based "primarily" in reliance on the advice of counsel, Defendant Jackson. See Gavigan 1/6/00 Dep. at 25, Exh. 4 hereto.

145. At most, Defendants had a possible, although unlikely to succeed at trial, claim for injunctive relief (not damages) against Bobrick solely for a potential violation of the Lanham Act. However, instead of pursuing just that claim, Defendants piled on additional claims, additional parties and additional damages with no good faith basis in fact or law, resulting in years of tortuous litigation and the expenditure of millions of dollars in attorneys' fees and costs.

## VI.    PROCEDURAL HISTORY FOLLOWING DISCOVERY IN THE 1996 LITIGATION

### A.    Cross Motions for Summary Judgment

146. On November 13, 2000, Bobrick and Hornyak moved for summary judgment in its favor and against Santana as to all claims asserted. The briefs filed by Bobrick and Hornyak filled hundreds of pages, with thousands of pages of exhibits.

### B.    Demand for Withdrawal of Santana's Claims

147. On March 21, 2001, while the parties' cross motions for summary judgment were pending and before the District Court had held oral argument, counsel for Bobrick wrote to counsel for Santana to advise that Bobrick intended to pursue its available legal remedies against

Santana and its counsel, pursuant to 28 U.S.C. § 1927, unless Santana withdrew its baseless

Complaint on or before April 13, 2001:

> This letter serves to provide notice that Bobrick intends to seek recovery of its "excess costs, expenses, and attorneys' fees" from you and your co-counsel personally, pursuant to 28 U.S.C. § 1927, unless Santana withdraws its complaint in the above matter on or before April 13, 2001. We believe the application of § 1927 has now been clearly triggered in the face of the Third Circuit's trilogy of binding authorities on the Noerr-Pennington Doctrine and by the Third Circuit's recent pronouncement in Barnes Foundation v. Township of Lower Merion, 2001 U.S. App. LEXIS 3347 (3d Cir. Mar. 5, 2001) (Greenberg, J.) on that same case dispositive Doctrine.
>
> In Barnes, a foundation sued a township and certain private individual residents, claiming the defendants conspired to discriminate against the foundation on the basis of race, in violation of the foundation's civil rights. In 1996, District Judge Brody held that the Noerr-Pennington Doctrine protected the individual defendants from liability, even under the civil rights laws, where defendants were private individuals who aired concerns to the township about the impact of a museum's reopening on traffic and noise. See Barnes Found. v. Township of Lower Merion, 927 F. Supp. 874, 876 (E.D. Pa. 1996) (Brody, J.), cited in Bobrick's Memorandum in Support of Its Motion for Summary Judgment, filed November 10, 2000, at 31, 32, 39, 41, 47, and 48.
>
> Thereafter, defendants alleged that the foundation's lawsuit was both legally and factually groundless and sought appropriate attorneys' fees against plaintiff. District Judge Buckwalter denied the fee petition, and the Third Circuit reversed. Specifically, Circuit Judge Greenberg, writing for the Court, affirmed the denial on the basis of legal frivolousness only because the Court concluded that the applicability of Noerr-Pennington to §§ 1985 and 1983, as well as antitrust claims had not been sufficiently clear at the time plaintiffs filed their lawsuit in January 1996 to warrant the imposition of fees. See id. at *30 ("[T]hough the issue is close, ... the district court did not err in determining that the Barnes' claim was not legally frivolous.").
>
> However, as to factual groundlessness, the Court reversed, concluding that it was "outrageous" for plaintiff to file the lawsuit in 1996 where there was insufficient evidence of conspiracy or racial animus. See id. at *39-40 ("There was, therefore, no

evidence indicating racial animus on the part of five of the six
defendants . . . Nevertheless, in the absence of that evidence the
district court relied on generalized assertions of discriminatory
treatment to permit an inference to be drawn of racial animus on
the part of all of the neighbors and thus of the appellants. This
reliance plainly was contrary to the Supreme Court's ruling in
Claiborne Hardware that in order to hold an individual liable by
reason of association with a group there must be evidence, judged
according to the strictest law, that the individual held a specific
intent to further those illegal aims. Accordingly, as to
appellants . . . the district court erred in concluding that the Barnes'
complaint was not factually groundless and we thus will reverse
the district court's order denying their motion for attorney's fees.
... In reaching our result, we feel constrained to point out that
surely it is outrageous that the Barnes, while purportedly securing
its own civil rights, brought a groundless action against the
appellants thereby trampling their First Amendment rights.")
(citing NAACP v. Claiborne Hardware Co., 458 U.S. 886, 918-19
(1982) (emphasis added); Pfizer Inc. v. Giles (In re Asbestos
School Litigation), 46 F.3d 1284, 1289 (3d Cir. 1994)).

Bobrick's counsel went on to state:

In even more frank language directed toward potential plaintiffs,
the Court emphasized the overriding importance of the First
Amendment concerns underlining the Noerr-Pennington Doctrine:
"Before we close our discussion of the Noerr-Pennington doctrine
we hasten to add that persons contemplating bringing suits to stifle
First Amendment activity should draw no comfort from this
opinion because the uncertainty of the availability of a First
Amendment defense when a plaintiff brings a civil rights case now
has been dispelled. This point is of particular importance in land-
use cases in which a developer seeks to eliminate community
opposition to its plans as this opinion should make it clear that it
will do so at its own peril." Id. at *21-22. (Emphasis added.)

Moreover, the Third Circuit further emphasized that "the practice
of persons sharing common views banding together to achieve a
common end is deeply embedded in the American political
process," see id. at *21, and that the Doctrine has been and should
be applied in non-antitrust contexts, see id. at *21-22. Thus, the
Third Circuit has now reaffirmed (for the fourth time in three
years) the constitutional strength and broad scope of the Noerr-
Pennington Doctrine.

The Third Circuit's Barnes decision underscores, more than ever,
the baselessness of the case you have filed. First of all, on the

> facts, you (and your client), like the plaintiffs in <u>Barnes</u>, failed to
> conduct an adequate factual investigation to support your claims
> before you filed this case in October 1996. Your recent limited
> production of additional privileged documents only strengthens
> that conclusion. Second, at this point in time, the case law, with
> the <u>Barnes</u> decision, is crystal clear regarding both the application
> of the <u>Noerr-Pennington</u> Doctrine and the lack of proof of
> conspiracy, so your case is at least groundless from March 5, 2001
> forward. Therefore, your continuation of the prosecution of this
> case would be in bad faith.

The letter concluded:

> Accordingly, for the reasons set forth above and in our briefs in
> support of Bobrick's Motion for Summary Judgment, and in
> opposition to Santana's Motion for Partial Summary Judgment, we
> intend to seek recovery of such "excess costs, expenses, and
> attorneys' fees," from this date forward, and you are hereby given
> notice thereof, unless you withdraw your complaint by April 13,
> 2001.

<u>See</u> Letter of Carl W. Hittinger, Esquire to William F. Jackson, Esquire, dated March 21, 2001,

Exh. 24 hereto (footnotes omitted) (emphasis added). Santana refused to withdraw its claims.

148. On March 23, 2001, counsel for Hornyak, Walter Casper, Jr., Esquire also

wrote to counsel for Santana:

> For the same general reasons set forth in Carl Hittinger's letter to
> you dated March 21, 2001, this letter serves to provide notice that
> The Hornyak Group and Vogel Sales Company also intend to
> pursue their available legal remedies against you and your co-
> counsel pursuant to 28 U.S.C. § 1927 unless Santana withdraws its
> Complaint in the above matter on or before April 13, 2001.
>
> <u>Additionally, I fail to see even a single reference to either Hornyak</u>
> <u>or Vogel in those privileged documents that you produced this</u>
> <u>week. This confirms that you and your client failed to conduct any</u>
> <u>(let alone adequate) factual investigation to support your claims</u>
> <u>against Hornyak and/or Vogel before you filed this case in</u>
> <u>October, 1996.</u> This failure, along with your failure to obtain any
> sufficient evidence of wrongdoing by either Hornyak or Vogel
> since the filing of your Complaint in October, 1996, establishes
> that Santana has brought a groundless action against my clients.
> As a result, your continuation of the prosecution of this case
> against Hornyak and/or Vogel will be in bad faith.

See Letter of Walter F. Casper, Jr., Esquire to William E. Jackson, Esquire, dated March 23, 2001, Exh. 25 hereto (emphasis added). Santana never responded to that letter.

149. Thereafter, Santana (and the other Defendants) refused to withdraw their Complaint and continued to prosecute the baseless claims against Bobrick and Hornyak before the District Court and on appeal to the Third Circuit and the Supreme Court, resulting in the needless expenditure of millions of dollars in fees and costs. See Letter of Walter F. Casper, Jr., Esquire to Gerald J. Butler, Esquire, dated May 16, 2003, Exh. 26 hereto. Santana never responded to that letter requesting that Hornyak be dropped from the appeal.

150. Significantly, Defendant Gavigan recently testified that he was never shown the above referenced letters sent to Mr. Jackson. He also stated that Defendant Jackson never even discussed the letters with him or anyone else at Santana to his knowledge. See 11/9/06 Gavigan Dep. at pp. 68-70, Exh. 3 hereto.

C.    **Resolution of the Parties' Cross Motions for Summary Judgment**

151. On April 30, 2002, Chief Judge Vanaskie held lengthy oral argument on the parties' cross motions. Defendant Jackson argued for Santana.

152. The undersigned Carl W. Hittinger, Esquire, represented Bobrick and argued on its behalf at the argument. Hornyak was represented by the undersigned Walter Casper, Jr., Esquire.

153. Incredibly, Santana chose not to make any argument (though given the opportunity by the District Court) regarding Hornyak.

154. On March 7, 2003, in a comprehensive 169-page Opinion and Order, Chief Judge Vanaskie granted Hornyak and Vogel's Motion for Summary Judgment in full and dismissed both parties from the lawsuit with prejudice as to all claims. See Santana Products,

Inc. v. Bobrick Washroom Equipment, Inc., 249 F. Supp.2d 463 (M.D. Pa. 2003) (Vanaskie, Ch.

J.).

      155.  Therein, as to Hornyak, Chief Judge Vanaskie held, with regard to Santana's

claim under Section 1 of the Sherman Act, based on well-established authority:

> As to the substantive merits of Santana's claims, I have concluded
> that Hornyak and Vogel, as captive sales representatives of
> Bobrick, cannot be held liable under section 1 of the Sherman Act.
> I have further found that the assailed marketing campaign did not
> constitute an unlawful restraint on trade and that, in any event,
> Santana has shown no more than a *de minimis* effect on
> competition, thus warranting summary judgment in favor of the
> defendants on the Sherman Act § 1 claim.

Santana Products, 249 F. Supp.2d at 470 (emphasis added).

      156.  Also as to Hornyak, Chief Judge Vanaskie held, with regard to Santana's claim

under Section 2 of the Sherman Act:

> Defendants are also entitled to summary judgment on the § 2 claim
> because, for essentially the reasons articulated by Judge Mishler in
> the parallel case of Santana Products, Inc. v. Sylvester &
> Associates, Ltd., 121 F. Supp. 2d 729 (E.D.N.Y. 2000), the "shared
> monopoly" claim presented by Santana is not cognizable under
> section 2 of the Sherman Act.

Santana Products, 249 F. Supp.2d at 470 (emphasis added).

      157.  Additionally as to Hornyak, Chief Judge Vanaskie held, with regard to

Santana's further claim of tortious interference:

> Summary judgment in favor of the defendants on the tortious
> interference claim is warranted because Santana has failed to
> present evidence of the loss of a prospective contract with a non-
> public customer within the one-year limitations period.

Santana Products, 249 F. Supp.2d at 470-71 (emphasis added).

158.  Chief Judge Vanaskie rejected Bobrick's laches defense and further held that that genuine issues of material fact as to some of the advertising at issue prevented the entry of summary judgment in favor of Bobrick on Santana's Lanham Act claim:

> Finally, there are issues of material fact that preclude summary adjudication of the Lanham Act claim.

Santana Products, 249 F. Supp.2d at 471.

159.  Chief Judge Vanaskie then certified his Order as to the Lanham Act claim for immediate appeal under Fed. R. Civ. P. 54(b) and 28 U.S.C. § 1292(b).  See Santana Products, 249 F. Supp.2d at 471.

160.  Chief Judge Vanaskie also held that Bobrick bulletin TB-73, which Bobrick and Hornyak were accused of distributing, was not literally false.  See Santana Products, 249 F. Supp.2d at 535-36 ("**Summary:**  Advisory Bulletin TB-73 is not literally false in any respect.") (emphasis in original).

161.  As to Bobrick and Hornyak's defense under Noerr-Pennington doctrine, Chief Judge Vanaskie held, based on well-established authority in the Third Circuit and elsewhere:

> Bobrick, Hornyak, and Vogel have each moved for summary judgment on the ground that liability on Santana's federal statutory and state common law claims is foreclosed or severely restricted by application of the Noerr/Pennington doctrine. Specifically, defendants contend that the Noerr/Pennington doctrine precludes liability for alleged injuries resulting from decisions of governmental actors to adopt bid specifications that effectively excluded Santana's HDPE toilet partitions.
>
> * * *
>
> Co-defendants Hornyak and Vogel also moved for summary judgment on the basis of the Noerr/Pennington doctrine. Both Hornyak and Vogel presented evidence that their sales activity were directed exclusively at public entities. Santana did not dispute this characterization of the evidence.  Indeed, Santana's opposition

> brief does not address the applicability of the Noerr/Pennington
> doctrine to the alleged actions of Hornyak and Vogel.
> Accordingly, Hornyak and Vogel are entitled to entry of judgment
> in their favor on all claims solely on the basis of the
> Noerr/Pennington defense.

Santana Products, 249 F. Supp.2d at 479, 494, n.24 (emphasis added).

162. Hornyak had also asserted a defense that Santana had proffered inadequate

proof of conspiracy, required to state a claim under Section 1 of the Sherman Act. With regard to

that defense, Chief Judge Vanaskie held based on well-established authority:

> The evidence of record will be assessed against the backdrop of
> these standards to determine whether there is sufficient evidence to
> either compel or allow a jury to draw a conclusion that Bobrick
> engaged in concerted action. Before addressing this issue,
> however, it is appropriate to determine whether Bobrick's
> commission sales-representatives, co-defendants Hornyak and
> Vogel, can be held accountable under section 1 of the Sherman
> Act.
>
> a. The alleged concerted action of Bobrick's sales representatives
>
> Santana seeks to hold Hornyak and Vogel liable under § 1 of the
> Sherman Act based upon their interaction with their principal,
> Bobrick. Hornyak and Vogel counter by arguing that a captive
> sales agency, i.e., one exclusively selling only the principal's
> products, is incapable of conspiring with the principal as a matter
> of law.
>
> In Copperweld Corp. v. Independence Tube Corp., 467 U.S. 752,
> 81 L. Ed. 2d 628, 104 S. Ct. 2731 (1984), the Court ruled that a
> parent company and its wholly-owned subsidiaries are not legally
> capable of conspiring with one another for purposes of liability
> under § 1 of the Sherman Act. This holding was based upon the
> fact that, in such a relationship, the parent and subsidiary "have a
> complete unity of interest." Id. at 771. As the Court explained:
>
>> If a parent and a wholly-owned subsidiary do
>> 'agree' to a course of action, there is no sudden
>> joining of economic resources that had previously
>> served different interests, and there is no
>> justification for § 1 scrutiny.

> ... In reality a parent and a wholly-owned subsidiary always have a "unity of purpose or a common design." They share a common purpose whether or not the parent keeps a tight rein over the subsidiary; the parent may assert full control at any moment if the subsidiary fails to act in the parent's best interests.

Id. at 771-72 (emphasis added).

In Siegel Transfer, our Court of Appeals extended the rationale of Copperweld to agents of a corporation, including separately incorporated entities that served as agents of the corporation. 54 F.3d at 1134-35. Judge Mansmann, writing for the unanimous court, explained that the fact that the agent's economic well-being was directly tied to the principal's success, as well as the fact that the agent did not compete with the principal, compelled the conclusion that the principal and agent "constituted one economic unit." Id. at 1135.

There is no dispute that Hornyak and Vogel were compensated by Bobrick based upon the amount of Bobrick product they sold. There also appears to be no dispute that Hornyak and Vogel exclusively sold Bobrick toilet partitions. It is thus clear that there exists in this case the requisite unity of economic interests that renders Hornyak and Vogel incapable of conspiring with Bobrick. See Peerless Heater Co. v. Mestek, Inc., 2000 U.S. Dist. LEXIS 6664, No. Civ. A. 98-CV-6523, 2000 WL 637082, at *6 (E.D. Pa. May 11, 2000).

Santana Products, 249 F. Supp.2d at 504-505 (emphasis added).

Chief Judge Vanaskie went on to state:

> Santana asserts that Vogel and Hornyak should be precluded from relying upon their commission relationship with Bobrick because they refused to disclose during discovery the amount of commissions they received. Indeed, the Special Master appointed to oversee discovery in this case issued a protective order to bar disclosure of the amount of commissions. The amount of the commissions, however, is not pertinent to the question of whether there was a unity of economic interests. Thus, the fact that Vogel and Hornyak refused to produce information concerning the amount of the commissions they earned does not preclude them from relying upon their relationship with Bobrick to avoid liability under § 1 of the Sherman Act.

Santana also appears to claim that Hornyak and Vogel may be held liable because they were aware of the role that Formica and others played in the alleged conspiracy. The evidence that Santana cites in support of this contention shows only that Hornyak and Vogel conducted anti-HDPE marketing, including showing the Formica video and burning samples of HDPE, in order to sell Bobrick products. In other words, Hornyak and Vogel were advancing the cause of their corporate principal. <u>There is no evidence that either Hornyak or Vogel assisted the efforts of other TPMC members. Indeed, Santana has not cited any evidence indicating that Hornyak and Vogel had any contact with Formica or the TPMC members. At most, Hornyak and Vogel were aware of the role of Formica in developing the Formica video.</u> (Pl. Rev. Stat. of Material Facts/Sherman Act, Dkt. Entry 382, PP 111E, 111H.) <u>Such evidence is insufficient to show the requisite unity of purpose, common design and understanding, or meeting of the minds in an unlawful arrangement that animates § 1 liability. Accordingly, Vogel and Hornyak are entitled to summary judgment on Santana's § 1 claim.</u>

<u>Santana Products</u>, 249 F. Supp.2d at 505-06 (emphasis added).

163.  As a result, as set forth above, Chief Judge Vanaskie held that Santana's claim against Hornyak for an alleged violation of Section 1 of the Sherman Act was barred on four separate and distinct bases and should be dismissed:

        (a)     No unlawful restraint on trade;

        (b)     <u>De minimis</u> harm to competition;

        (c)     No conspiracy as a matter of law, because Hornyak was a "captive sales representative" of the alleged co-conspirator; and

        (d)     The <u>Noerr-Pennington</u> Doctrine.

164.  Chief Judge Vanaskie also held that Santana's claim against Bobrick for an alleged violation of Section 1 of the Sherman Act was similarly without merit and dismissed the claim after stating:

Notwithstanding Santana's characterization of the evidence to the contrary, however, there is no "direct" evidence of Bobrick's knowing participation in a conspiracy to restrain trade....While

> Santana has demonstrated that it lost some sales to Bobrick and
> other solid phenolic manufacturers, it has not presented evidence
> of significant injury to competition, even when the analysis
> encompasses the public sector. ...The conclusion that Santana
> failed to show the requisite harm to competition is buttressed when
> conduct protected by the Noerr/Pennington doctrine is excluded
> from the analysis. Santana has made no showing whatsoever with
> respect to the non-public market for toilet partitions. No
> information was provided, for example, as to the percentage that
> the non-public market bears to the total market. Accordingly,
> Santana's failure to show harm to competition provides an
> independent basis for granting summary judgment in favor of
> Bobrick on the section one claim.

Santana Products, 249 F. Supp.2d at 506, 517-518.

165. The tortious interference claim against Bobrick was also dismissed on summary

judgment by Chief Judge Vanaskie:

> There is no dispute that the Noerr/Pennington doctrine applies to
> the tort of interference with prospective contractual relations. As
> the only claim of a lost contract during the limitations period
> concerning a public entity, the Rio Hondo Community College, it
> is evident that Santana cannot maintain a tortious interference
> claim.

Id. at 543 (emphasis added).

166. In reaching its conclusion regarding Section 1 of the Sherman Act, Chief Judge
Vanaskie conclusively held that a violation of the Act in a case like this is determined through a
case-by-case application of the "rule of reason," where the fact finder weighs all of the
circumstances of a case in deciding whether a restrictive practice should be prohibited as
imposing an unreasonable restraint on competition. As such, Chief Judge Vanaskie flatly
rejected Santana's contention that the defendants' conduct merited per se condemnation as
"manifestly anti-competitive." Id. at 508. See also Id. at 511 ("In this case, the economic impact
of the challenged practices is far from obvious. Therefore, the per se rule is inapplicable in this
case.").

167. With regard to Santana's Sherman Act § 2 claim against Hornyak and Bobrick, Chief Judge Vanaskie essentially agreed with the holding of District Judge Mishler in the parallel case of Santana Products, Inc. v. Sylvester & Associates, Ltd., 121 F. Supp. 2d 729 (E.D.N.Y. 2000):

> Having carefully considered Judge Mishler's well-reasoned opinion as well as the case law that he canvassed, I concur with his conclusion: Santana has presented no more than a claim of conspiracy among competitors to restrain trade, but has not shown that competition among the conspirators has been diminished in any way. Such a claim may not be maintained under section 2 of the Sherman Act.

Santana Products, 249 F. Supp.2d at 520 (emphasis added). Santana did not appeal this holding.

168. Finally, Chief Judge Vanaskie summarized his findings as to Hornyak:

> As a result of these rulings, judgment will be entered in favor of Hornyak and Vogel as to all claims ....

Santana Products, 249 F. Supp.2d at 545 (emphasis added).

169. Chief Judge Vanaskie did not find any probable cause for Santana to assert any claims against Hornyak. This is unequivocally shown by his March 7, 2003 Order which succinctly and clearly stated that, "Defendant Hornyak Group, Inc.'s motion for summary judgment, (Dkt. Entry 287), is GRANTED. (a) Defendant Hornyak Group, Inc. is DISMISSED. (b) This is a FINAL JUDGMENT in accordance with Fed. R. Civ. P. 54(b)."See March 7, 2003 Order by Judge Vanaskie at 1, Exh. 27 hereto.

170. Chief Judge Vanaskie's March 7, 2003 Order further emphasized that the Lanham Act Claim (Count III of the Complaint) was the only claim as to Bobrick subject to a genuine issue of material fact, based on his rejection of Bobrick's laches defense, and that the Lanham Act claim remained against Bobrick as to only certain advertisements for purposes of trial:

Defendants Bobrick Washroom Equipment, Inc. and Bobrick
Corp.'s ("Bobrick's") motion for summary judgment, (Dkt. Entry
294), is GRANTED IN PART and DENIED IN PART.    (a)
Defendant Bobrick's motion for summary judgment is GRANTED
as to Counts I, II, and IV of the Complaint.    (b) Defendant
Bobrick's motion for summary judgment is DENIED as to Count
III of the Complaint. (c) This is a FINAL JUDGMENT in favor of
Bobrick as to Counts I, II and IV, in accordance with Fed. R. Civ.
P. 54(b).

Id. at 2.

### D.    Santana's Appeal to the United States Court of Appeals for the Third Circuit

171.  Santana subsequently filed two petitions in the United States Court of Appeals

for the Third Circuit, for immediate appeal pursuant to, respectively, 28 U.S.C. §§ 1291 and

1292(b), and pursuant to the "final order" doctrine under Fed. R. Civ. P. 54(b). The petitions

were signed by Defendant Jackson.

172.  Bobrick subsequently filed one petition for immediate appeal pursuant to

28 U.S.C. § 1292(b) in the Third Circuit on the Lanham Act Count.

173.  Thereafter, Santana filed two separate, but related appeals, in the Third Circuit,

captioned as Santana Products, Inc. v. Bobrick Washroom Equipment, Inc., et al., Docket No.

03-1845 and Santana Products, Inc. v. Bobrick Washroom Equipment, Inc., et al., Docket

No. 03-2283. These briefs were signed by Defendant Jackson.

174.  On March 23, 2004, the parties participated in oral argument before a three-

judge panel of the Third Circuit on Appeal Nos. 03-1845 and 03-2283. Counsel, Carl Hittinger

and Walter Casper, appeared and argued on behalf of Bobrick and Hornyak, respectively.

Defendant Jackson argued on behalf of Santana. Santana raised no argument as to Hornyak. See

Transcript of Third Circuit argument dated March 23, 2004, Exh. 28 hereto.

175.  On February 9, 2005, Circuit Judges Roth, Ambro and Chertoff issued a

comprehensive unanimous Opinion affirming Chief Judge Vanaskie on the dismissal of the

antitrust and tortious interference claims that pertained to Bobrick and Hornyak. See <u>Santana</u>

<u>Products, Inc. v. Bobrick Washroom Equipment, Inc.</u>, 401 F.3d 123 (3d Cir. 2005) (Roth, J.).

      176. With regard to both Bobrick and Hornyak, the Third Circuit held, based on

well-established authority, that Santana had failed to establish an unlawful unreasonable restraint

on trade, which fatally flawed its antitrust claim.

> We fail, however, to find 'restraint' in this alleged activity - and
> without a 'restraint,' there is 'no restraint of trade.' Here, Santana's
> antitrust claim is built on allegations that the defendants criticized
> the safety of HDPE partitions. It is undisputed that the defendants
> informed potential customers that Santana's product presented
> safety hazards. <u>Santana has not, however, demonstrated that</u>
> <u>Bobrick imposed any restraints on trade.</u> Santana does not allege
> that Bobrick engaged in coercive measures that prevented Santana
> from selling its products to any willing buyer or prevented others
> from dealing with Santana. Moreover, Santana's allegations of
> fraud in the manner in which the hazards of HDPE were portrayed
> are irrelevant because 'deception, reprehensible as it is, can be of
> no consequence so far as the Sherman Act is concerned.'...<u>This is</u>
> <u>classic competition on the merits of a product.</u>"

<u>Santana Products</u>, 401 F.3d at 132-133 (citation omitted) (emphasis added).

      177. With regard to the conspiracy claim as to Hornyak, the Third Circuit held, also

based on well-established precedent:

> The District Court held that Santana proved the concerted action
> element as to Bobrick, and Bobrick does not challenge this finding.
> <u>Santana, however, does appeal the District Court's conclusion that</u>
> <u>it did not prove concerted action as to Hornyak and Vogel.</u>
> Santana seeks to hold Hornyak and Vogel liable under § 1 based
> on their relationship and interaction with Bobrick. Hornyak and
> Vogel argued to the District Court that they were incapable of
> conspiring with Bobrick as a matter of law because they sold
> Bobrick's products exclusively. The court, relying on the Supreme
> Court's decision in <u>Copperweld Corp. v. Independence Tube Corp.</u>,
> 467 U.S. 752, 81 L.Ed. 2d 628, 104 S.Ct. 2731 (1984), and our
> decision in <u>Siegel Transfer, Inc. v. Carrier Express, Inc.</u>, 54 F.3d
> 1125 (3d Cir. 1995), held that, as a matter of law, Hornyak and
> Vogel were incapable of conspiring. 249 F. Supp. 2d at 505-06.

> As with the Noerr/Pennington issue, we do not need to resolve this question because, even if we were to hold Santana did prove concerted action as to Hornyak and Vogel, Santana's § 1 claim would still fail.

Santana Products, 401 F.3d at 131, n.14 (emphasis added)

178. With regard to the tortious interference claim, the Third Circuit, in affirming the District Court, held as follows:

> Santana argues it was reasonably probable that it would have obtained the contract but for the defendant's marketing campaign because it had approximately 60% of the HDPE market segment, had a favorable track record with the customer, and had actually been specified. Despite the specification of HDPE for the Rio Hondo project, we cannot say, however, that it was reasonably probable that Rio Hondo was going to award the contract to Santana. Even though Santana had convinced Rio Hondo to specify its partitions, Santana did not have a "reasonable probability of *obtaining* the contract" for the work. Because Bobrick persuaded Rio Hondo to change the specification to phenolic instead of HDPE, Santana was simply denied an opportunity to bid. However, even if Santana had had the opportunity to bid, one of the two other suppliers of HDPE partitions - Capital Partitions or Comtec - could still have obtained the contract. There is no evidence that Santana would be the winning bidder. The problems with obtaining a government contract in this situation is demonstrated by the fact that Rio Hondo did not in fact award the contract to Bobrick.

Santana Products, 401 F.3d at 140-141 (citation and footnote omitted) (emphasis added).

179. The Third Circuit reversed the District Court's findings as to the application of the laches defense and dismissed the remaining Lanham Act claim against Bobrick on that basis. Id. at 135-140.

### E.    Santana's Petition for Rehearing En Banc and Panel Rehearing

180. On February 22, 2005, Santana filed a Petition for Rehearing En Banc and for Panel Rehearing.

181. On April 11, 2005, the Third Circuit denied Santana's Petition, both with regard to Rehearing En Banc and Panel Rehearing.

F.    **Santana's Petition for a Writ of Certiorari**

182.  On August 8, 2005, Santana filed a Petition for a Writ of Certiorari in the

Supreme Court of the United States.  Therein, other than listing Hornyak as a party, Santana did

not mention it by name, nor did it articulate, in its 27-page Petition, how Hornyak's conduct

caused an unreasonable restraint of trade, which was the primary issue on appeal.  Santana's

Petition was filed by counsel of record David C. Frederick, Esquire.  Defendant Jackson was also

listed as counsel for Santana on the Petition.

183.  On October 20, 2005, Bobrick and Hornyak filed Briefs in the United States

Supreme Court opposing Santana's Petition for Certiorari.

184.  On November 28, 2005, the Supreme Court denied Santana's Petition for

Certiorari.  Santana Products, Inc. v. Bobrick Washroom Equipment, Inc., 126 S. Ct. 734 (2005).

185.  The individual and joint defense of Bobrick and Hornyak against Santana's

baseless claims resulted in the needless expenditure of millions of dollars in fees and costs.

G.    **Subsequent Litigation Following the Conclusion of the 1996 Litigation**

(i) **Subsequent Santana Products, Inc. v. Sylvester & Associates, Ltd. and Frederick E. Sylvester Case**

186.  As is set forth above, on October 30, 1998, Santana refiled the same substantive

Complaint in the United States District Court for the Eastern District of New York, but therein,

named only Sylvester & Associates, Ltd. and Frederick E. Sylvester as defendants.  See generally

Santana Products, Inc. v. Sylvester & Associates, Ltd. and Frederick E. Sylvester, U.S.D.C.,

E.D.N.Y. No. 98-CV-6721.

187.  In that action, plaintiff asserted claims against Sylvester under Section 43(a) of

the Lanham Act and sought damages under the Donnelly Act and New York State General

Business Law § 340.  The claims asserted were nearly identical to those previously raised by

Santana against Sylvester in the Middle District of Pennsylvania, from which Sylvester had been dismissed on personal jurisdiction grounds.

188. Following the Complaint, the Sylvester Defendants filed a Motion to Stay Discovery based upon the pending disposition of the 1996 litigation in the Middle District of Pennsylvania. Specifically, Sylvester argued that the holdings in the Pennsylvania case would necessarily affect the outcome of the claims filed in New York. Santana strongly opposed the Motion to Stay representing that there were different issues in both cases. See Santana's Memorandum of Law in Opposition to Defendants' Motion for Stay of Discovery, dated July 1, 1999 at 7 ("Thus, the parties, alleged facts and counts are not identical between the instant and Pennsylvania cases, although there may be some overlap in the evidence presented. Any assertion by defendants to the contrary is manifestly disingenuous." (emphasis added). The motion to stay was denied by Judge Mishler based on Santana's representation. Sylvester, therefore, was forced to engage in years of burdensome and costly discovery.

189. Thereafter, despite Santana's strong words in opposition to the Sylvester Defendants' Motion to Stay Discovery, on February 15, 2001 (just eighteen months later) and on the eve of Sylvester filing a motion for summary judgment, Santana itself moved for a stay of all proceedings, pending the final disposition of cross motions for summary judgment pending in the Pennsylvania action.

190. On April 26, 2001, Judge Mishler granted Santana's Motion for Stay of Proceedings, largely based upon Santana's turnabout representation that it "agrees to be bound by the determination of the Pennsylvania court in the New York action contingent upon review in the Third Circuit." See Memorandum of Decision and Order by Judge Mishler, dated April 26, 2001 at 7 n.1 (emphasis added).

191.  After the appeals in the 1996 Litigation were exhausted, on March 31, 2006, Santana filed a Motion for Dismissal with Prejudice pursuant to Fed. R. Civ. P. 41(A)(2), asking the District Court to dismiss the case without requiring Santana to pay any of the reasonable attorney fees incurred by Sylvester in defending the meritless action.  Oral argument on the Motion were heard on June 9, 2006 by Chief Magistrate Judge Orenstein, who, immediately thereafter, read his Report and Recommendations into the record and granted Santana's Motion (thus, denying Sylvester's request for attorneys' fees).

192.  Thereafter, the Sylvester Defendants sought *de novo* review before District Judge Allyne R. Ross.  That briefing was completed on August 17, 2006 and, subsequently, on August 30, 2006, Sylvester requested oral argument in lieu of a reply brief.  It was further requested by letter (in accordance with established internal operating procedures) that Judge Ross hold an evidentiary hearing as to bad faith and the lack of any pre-complaint investigation by Santana's counsel.  The requests were denied and Judge Ross thereafter issued an Opinion and Order without oral argument or an evidentiary hearing.

193.  Although Judge Ross's November 13, 2006 29-page Opinion and Order rejected the standard of review upon which Chief Magistrate Judge Orenstein had based his opinion, it nonetheless granted Santana's motion for dismissal without awarding any attorneys' fees.

194.  However, in granting Santana's Motion, Judge Ross based her Opinion and Order on factual and legal findings that either ignored or were not consistent with the prior factual and legal findings of Chief Judge Vanaskie in the 1996 litigation in the Middle District of Pennsylvania, as affirmed by the Third Circuit.  Importantly, as noted above, the parties had

stipulated that those facts and legal findings in the Pennsylvania case were conclusively

established and binding.

195. It is without question that Santana voluntarily agreed to be bound by the

decision in the 1996 Litigation. As Santana represented to Judge Mishler:

> Because the Counts, the underlying issues and the material facts are
> ***virtually identical***, resolution of the summary judgment motions by
> the Pennsylvania Court will significantly narrow the issues to be
> decided by this Court.
>
> A determination by the Pennsylvania Court that an alleged activity
> is not violative of Section 43(a) of the Lanham Act, for example,
> would narrow that issue for determination in New York, because
> Santana now agrees to be bound by the determinations of the
> Pennsylvania Court in the New York action contingent upon the
> exhaustion of appellate review in the Third Circuit.
>
> ***
>
> ... Santana respectfully agrees to be bound by the decision of the
> Pennsylvania Court on the parties pending summary judgment
> motions, contingent upon the exhaustion of appellate remedies, and
> therefore no prejudice to Plaintiffs interests would result from the
> issuance of a stay.

See Plaintiff's Memorandum of Law in Support of Motion to Stay Proceedings, dated February
15, 2001 at 3, 7 (emphasis added).

196. Yet, despite the clear intent of the parties, Santana successfully persuaded

Judge Ross to violate well-established principles of collateral estoppel and res judicata by making

factual and legal findings that were inconsistent with the findings of Chief Judge Vanaskie and

the Third Circuit. Santana did so by mischaracterizing and misrepresenting the findings of Chief

Judge Vanaskie in the Pennsylvania case.

197. First and foremost, by way of example, Judge Ross conducted an independent

analysis of whether the materials known as Bobrick Advisory Bulletin TB-73 and the Metpar

Fact Sheet, also at issue in the Pennsylvania case, were either literally false or misleading within

the meaning of the Lanham Act. See Opinion and Order by Judge Ross dated November 13, 2006

at 13-18, Exh. 29 hereto. In reviewing this matter, Judge Ross noted that inasmuch "[a]s the [Metpar] fact sheet greatly resembles Advisory Bulletin TB-73" the analysis of whether the Advisory Bulletin was literally false or misleading "is largely applicable" to the analysis of the Metpar Fact Sheet. Id. at 17.

198. Judge Ross failed to fully acknowledge the prior binding findings of Chief Judge Vanaskie with regard to the same Advisory Bulletin TB-73. In the Pennsylvania Litigation, Santana claimed that TB-73 was literally false due to the absence of a disclaimer and because it allegedly implied that toilet compartments are governed by the requirements of certain safety codes. Santana Products, 249 F.Supp.2d at 535-36. Chief Judge Vanaskie clearly held:

> **Summary:** Advisory Bulletin TB-73 is not literally false in any
> respect. Therefore, Bobrick is entitled to judgment in its favor on
> this aspect of Santana's Lanham Act claim.

Id. at 536 (emphasis added).

199. In light of that binding finding, Judge Ross erred in conducting a further analysis as to whether TB-73 and related Metpar Fact Sheet were misleading as opposed to literally false.

200. Chief Judge Vanaskie clearly held that "Santana relies exclusively on literal falsity, eschewing an approach that would necessitate proof of actual consumer deception." Santana Products, 249 F.Supp.2d at 521 (emphasis added). It was also noted that "Santana does not attempt to argue that the offending advertisements were literally true but misleading, in which case Santana would be required to show that the targets of these advertisements – the architects and specifiers – were actually misled.." Id. at 525-26 (emphasis added).

201. Therefore, Judge Ross violated the principles of collateral estoppel and res judicata by engaging in a further analysis on the same facts as to whether the materials were

misleading, which issue could have been, but was purposefully not argued, to the Pennsylvania Court by Santana.

202. Because Santana did not litigate either the Pennsylvania and New York litigations under a theory of "literally true but misleading," it was error for Judge Ross to conduct an analysis as to whether Santana's claims regarding the *misleading* nature of the offending materials were brought in good faith. Simply stated, Santana never proceeded under that theory in nine years of litigation in either Pennsylvania or even New York. Accordingly, inasmuch Santana admitted that the issues in the two actions were virtually identical, under the doctrines of res judicata and collateral estoppel, the Court was barred from finding Santana's "good faith" based upon a theory Santana did not (but could have) substantively proceeded upon in the prior litigation.

203. Chief Judge Vanaskie had also previously held that "Santana has provided no evidence that a substantial number of architects and specifiers were deceived, though it has presented evidence of confusion of an insubstantial number of specific architects." Santana Products, 249 F.Supp.2d. at 526, n. 52. In contracts, Judge Ross erred by relying upon Santana's purported market researcher who, she said, surveyed "a *sizable group of people* who were at least arguably likely purchasers of the plaintiff's products." See Opinion and Order by Judge Ross dated November 13, 2006 at 17, Exh. 29 hereto. Those expert results had been challenged by defendant under Daubert, which Judge Ross did not address.

204. In doing so, Judge Ross gave Santana a second bite at the apple, which it was precluded from getting based on its stipulation to be bound to obtain a stay (to avoid further costs through re-argument).

205. Finally, Judge Ross improperly adopted Santana's argument that Santana's Lanham Act claims of false or misleading concerning TB-73 were supported by a 1974 Federal Trade Commission consent order, to which none of the defendants were parties. In doing so, Judge Ross held that the FTC consent order seemed to provide "a plausible justification" for plaintiff's claim as to the falsity and misleading nature of TB-73. Id. at 15-16.

206. However, this exact same argument had previously been made by Santana, and clearly rejected by Chief Judge Vanaskie:

> . . . Santana does not dispute, that Bobrick was not a member of the Society nor is it a manufacturer of plastic. An FTC consent order cannot be used to hold liable entities who are not a party to the decree. For this reason, the 1974 consent order did not impose any obligation upon Bobrick, and did not render the videotape's reference to the fire rating of SPC literally false."

Santana Products, 249 F. Supp. at 528-529 (emphasis added).

207. Judge Ross did not cite to this contrary finding, nor did Santana refer to this finding in its briefings. It was simply ignored, with Santana getting a second improper bite at the apple.

208. In addition, Santana also raised other new arguments before Judge Ross that had not previously been raised in the Pennsylvania Litigation before Chief Judge Vanaskie in an attempt to essentially re-litigate the issues that Chief Judge Vanaskie and the Third Circuit had already carefully addressed and disposed of against Santana. For example, as noted, in the Pennsylvania Litigation, Santana relied exclusively on a theory of "literal falsity" with respect to its Lanham Act claims. Santana Products, 249 F.Supp.2d at 521. Chief Judge Vanaskie noted that Santana did not even attempt to argue the allegedly offending materials were literally true but rather misleading. Id. at 525-26.

209. A further example is Santana's argument, accepted by Judge Ross, that the requisite injury -- that its cost control losses in other parts of the country -- could be used to show injury and damages as to New York-based Sylvester. See Opinion and Order by Judge Ross dated November 13, 2006 at 24-26, Exh. 29 hereto. Santana failed to note that this same argument was made in the 1996 Pennsylvania case and rejected by the Pennsylvania District Court when it granted similarly situated Hornyak's motion for summary judgment and dismissed it from the case with prejudice as to all claims. See Santana's Revised Memorandum in Opposition to Non-Bobrick Defendant Vogel Sales Company's and the Hornyak Group's Motions Under Rule 56 for Summary Judgment, dated August 31, 2001, at 7.

210. In addition to making findings inconsistent with those of Chief Judge Vanaskie, Judge Ross's Opinion and Order further failed to conform to the clear precedents of the Second Circuit regarding the elements of proof necessary to establish claims and award attorneys' fees under Sections 43(a) and 35 of the Lanham Act, 15 U.S.C. § 1125, 1117.

211. Finally, as is mentioned above, Judge Ross's Opinion and Order was handed down without allowing the Sylvester Defendants an opportunity to present legal arguments and factual averments through a reply brief, oral argument or evidentiary hearing. Such conduct constituted an abuse of discretion and requires a remand to the District Court in order to conduct further proceedings.

212. District Judge Ross's November 13, 2006 Opinion and Order is currently on appeal to the Second Circuit Court of Appeals. Briefing has been completed and oral argument will be held in the fall.

**H.**    **Vogel v. Santana, _et al._, (C.P. :Lackawanna and Pennsylvania Superior Court).**

213.  On December 13, 2006, based upon the 1996 Litigation and Chief Judge Vanaskie's related holdings, Vogel Sales (like Hornyak, an independent sales agent of Bobrick) brought an action initially against Santana and Lynch, Sr. alleging Wrongful Use of Civil Proceedings and Abuse of Process under Pennsylvania's Dragonetti Act, 42 Pa. C.S.A. § 8351, _et seq._

214.  After Santana attempted for months to avoid service of the Complaint, limited discovery was permitted by the Court with the assistance of Discovery Master George Reihner. Santana had objected to any discovery, forcing Judge Minora to order the appointment of Discovery Master Reihner to get discovery moving.  During that limited discovery, new documents came to light which further establish and emphasize Defendants' knowledge of the baseless nature of the claims they brought and pursued in the underlying action.  Recently uncovered correspondence among Santana's counsel reveals Santana's improper motive for bringing the action against certain parties, which was done solely with the hope the parties would settle and then provide testimony against the remaining defendants to support Santana's case. Newly produced correspondence among counsel also establish Santana's early knowledge of the need for further investigation and evidentiary deficiencies, as well as the questionable per se standard application as its antitrust claims.

### (i)    **Newly Discovered Evidence**

215.  For example, one newly discovered letter, dated August 13, 1996, among counsel for Santana indicates that Santana initially intended to file, but not actually prosecute, an action against Bobrick and its architectural sales representative, including Hornyak, stating "it is

presently contemplated that our strategy would be to file but not serve the Bobrick complaint, and attempt to achieve a suitable settlement with Bobrick and/or the other Defendants before the Complaint would be formally served." See Letter from B. Aaron Schulman, Esq. to Gerald Butler, Esq. dated August 13, 1996 at 1, Exh. 30 hereto. Instead, Defendants simply filed the Complaint instead with no advance notice to Bobrick or Hornyak. The same correspondence indicates that other defendants (Hornyak, Vogel and Sylvester) were improperly joined in the lawsuit with the hope that "Santana will be able to settle with certain defendants, such as Fred Sylvester who (like William Von Korff) may ultimately agree to cooperate with us and provide testimony that supports Santana's positions in the litigation." Id. at 1-2.

216.  Another recently produced letter from counsel for Santana to Santana's President Lynch, Sr. from 1994 establishes that Santana knew, long before it commenced an action against Bobrick and Hornyak, that Santana faced significant evidentiary hurdles with respect to proving injury and damages through actual lost sales directly attributable to the alleged unlawful conduct of Bobrick and each of its sales representatives, including Hornyak. In that letter, Paul Esatto, counsel for Santana (who later handled the Sylvester case) acknowledged "However before a lawsuit is begun, two major evidentiary points must be investigated. ***First, evidence must be obtained of actual lost sales or other monetary loss because of the unlawful conduct the TPMC and Formica. This evidence is necessary to provide the causal connection between conduct and the injury suffered by Santana. If such evidence is not presently in your possession, we must discuss how we can obtain same." See Letter from Paul Esatto, Esq. to Michael Lynch dated September 14, 1994 at 1, Exh. 31 hereto. (emphasis added). This letter is illustrative of Santana's bad faith inasmuch as it was aware, as early as 1994, that it was necessary to come forward with evidence of actual lost private sales, which were casually connected to each

of the defendants named. After nine years of burdensome litigation and costly discovery,

Santana was not able to point to any evidence of a single lost private sale directly attributable to

the conduct of Hornyak or Bobrick, as noted above.

217. Another recently produced letter between Santana's counsel, dated May 13,

1994, illustrates the detailed discussion among counsel regarding the correct legal standard that

would apply to antitrust claims, prior to the underlying action being filed. Richard Stern,

Esquire, who authored the letter, explained that the antitrust claims being contemplated would <u>not</u>

be reviewed under the <u>per se</u> test, but instead would be subject to the much more rigorous and

expensive to prove rule of reason standard, which weighs a number of factors in determining

whether conduct is in fact in violation of the antitrust laws. Mr. Stern citing cases, later at issue

before Chief Judge Vanaskie, explained, "[T]he *Paddock* decision is representative of the

subsequent case law under Section 1. <u>The general rule is that concerted efforts to get product</u>

<u>specifications adopted are not illegal per se</u>. First, to prevail a plaintiff must show market effects,

adverse <u>impacts on the vigor of competition in the relevant market</u>. Second, the specifications

must not be reasonably established for there to be any violation. Misrepresentation is relevant

under the rule of reason, but it does not carry the day under Section 1 when adverse effects on

competition are not shown." See Memorandum from Richard Stern, Esq. to William Jackson,

Esq. dated May 13, 1994 at 4, Exh. 32 hereto. (emphasis added). His letter goes on to further

explain the difficult and high standard involved when conduct is reviewed under the rule of

reason. Defendant Jackson failed to heed that advice and instead filed the antitrust claim under a

per se standard, resulting in years of costly and burdensome litigation. Ironically, Mr. Stern

remained active in Santana's litigation, going so far as to be listed on Santana's Petition for

Certiorari to the Supreme Court. Therefore, there is no question that counsel were well aware of the correct legal standard involved with bringing the antitrust claims in the 1996 litigation.

218. Subsequently, Chief Judge Vanaskie found, as Mr. Stern predicted, based on the same legal authority, that the rule of reason not the per se standard, clearly governed. Santana Products, 249 F. Supp.2d at 508-510 ("In this case, the economic impact of the challenged practices is far from obvious. Therefore, the per se rule is inapplicable in this case.").

### (ii)  Santana's Preliminary Objections

219. In an attempt to avoid further discovery, Santana filed Preliminary Objections objecting to the legal sufficiency of Vogel Sales' Complaint and stating that the Complaint failed to properly allege that the 1996 Litigation was brought for an improper purpose or without probable cause. In doing so, they heavily relied upon Chief Judge Vanaskie's opinion in the 1996 litigation. However, in doing so, they grossly distorted and, in same situations, falsely characterized that opinion to the Common Pleas Court.

220. For example, Defendant Jackson represented in his brief at page 5 that, "the Court found that ... Vogel was not entitled to summary judgment on Santana's claim for damages under the Lanham Act". See Brief of Defendant William Jackson, dated March 14, 2007 at 5. In fact, Chief Judge Vanaskie's Order had specifically stated that "Vogel Sales Co.'s motion for summary judgment, (Dkt. Entry 291), is GRANTED. ... Defendants Vogel Sales Co. is DISMISSED." See March 7, 2003 Order by Chief Judge Vanaskie, Exh. 27 hereto. Jackson further represented that there were issues of material fact "found" with regard to Vogel, which Chief Judge Vanaskie clearly did not find as he granted Vogel's motion for summary judgment. See Brief of Defendant William Jackson, dated March 14, 2007 at 12, 21. Even more blatant in its mischaracterization of Chief Judge Vanaskie's Order, Defendant Jackson argued that the

District Court "granted Santana's motion for summary judgment of literal false advertising liability for Bobrick's "box lunch" advertising" and "held that Santana had proffered sufficient evidence for monetary and injunctive relief under the Lanham Act." See Brief of Defendant William Jackson at 5, 11. In addition and equally outrageous, Defendants reply brief stated that Chief Judge Vanaskie "denied" Vogel's motion for summary judgment on its Lanham Act claim. Brief of Santana Defendants, dated January 22, 2007 at 11. All of this blatantly contradicts Chief Judge Vanaskie's Order which clearly stated that "Vogel Sales Co.'s motion for summary judgment, (Dkt. Entry 291), is GRANTED. ... Defendants Vogel Sales Co. is DISMISSED." See Order dated March 7, 2003, Exh. 27 hereto. See also Chart of Misrepresentations, attached as Exh. 33 hereto.

221. The Honorable Carmen Minora of the Lackawanna County Court of Common Pleas, following briefing and oral argument by the parties, and apparently relying upon Santana's repeated mischaracterization of Chief Judge Vanaskie's underlying Opinion and Order, issued a 13-page Opinion holding that Vogel Sales' claims were insufficient as a matter of law and sustaining Santana's Preliminary Objections. See Memorandum and Order of Judge Minora dated May 23, 2007, Exh. 34 hereto.

222. Specifically, in seeking to establish "'what has [Vogel Sales] done wrong?'" Judge Minora found, relying upon the District Court's finding as to a joint-interest prohibiting an antitrust conspiracy between Vogel, Hornyak and Bobrick, that "Vogel had a unified economic interest, a unity of purpose and common design with Bobrick who has been judicially determined to have acted improperly both alone and with Hornyak." Id. at 8 (citing Santana Products, 249 F. Supp.2d at 505).

223. Specifically, Judge Minora found that, "'Bobrick and other non-HDPE toilet compartment manufacturers would have a joint interest in excluding from the market HDPE partitions thereby constraining supply and increasing prices." Id. at 10 (citing Santana Products, 249 F. Supp.2d at 507). Judge Minora purportedly based this finding of liability on the District Court's statement about the "requisite unity of economic interests, common purpose and unity of interests for antitrust conspiracy purposes . . ." which had prohibited a finding of any antitrust liability. Id.

224. In misinterpreting Chief Judge Vanaskie's finding regarding unified economic interest, used to reject antitrust liability on a conspiracy argument, Judge Minora concluded that, because there was such a unity of interest, any conduct that Bobrick committed that harmed Santana -- even in another jurisdiction or state -- had an indirect benefit to Pennsylvania-based Vogel Sales. Id. at 8-10.

225. As Judge Minora found: "Next to Bobrick who would stand most to benefit from such a successful arrangement? How about their exclusive sales agents Vogel and Hornyak whose sales commissions would increase along with the constraining of supply and the resultant increased prices." Id. at 10.

226. Importantly, neither Santana nor Defendant Jackson ever made such a "unity of economic interest" argument in their briefings or oral argument before Judge Minora. The argument also was never made before Chief Judge Vanaskie in the 1996 Litigation to establish liability as to Hornyak or Vogel, as shown by their dismissal with prejudice.

227. Judge Minora's opinion cited no case law to support his conclusion that Bobrick and its captive sales agents engaged in unlawful activity. More importantly, he provided no citations to Chief Judge Vanaskie's Opinion of such unlawful activity and did not address the

fact that Chief Judge Vanaskie specifically dismissed both Vogel and Hornyak outright in connection with all of Santana's claims. Only Bobrick was found partially liable under the Lanham Act as to some advertising methods related to private parties for purposes of summary judgment.

228. Judge Minora's "unity of economic interest" theory argument also led to unauthorized factual findings, which are not permitted at the preliminary objections stage. For example, Judge Minora used the "box lunch" program to support his conclusion that Vogel Sales was liable for Bobrick's conduct. Id. ("Viewing the three Defendants, Bobrick, Hornyak and Vogel as a unit further compels that the preliminary objections be granted when we look at the trial court's disposition of Bobrick's claims. 'The Bobrick box lunch is literally false... Thus, Santana is entitled to summary judgment on this aspect of its Lanham Act claim.' Opinion of J. Vanaskie supra at 537.") Yet, in the 1996 Litigation, Santana provided no proof that Vogel Sales ever successfully used the "box lunch" advertising to its benefit. Further, despite Chief Judge Vanaskie's specific finding that the defendants' conduct did not constitute an improper unreasonable restraint on trade, Judge Minora found, as a matter of law, that the "conspiracy" restrained supply and increased prices which benefited Vogel and Hornyak both. Id.

229. Clearly, either Judge Minora disagreed with Chief Judge Vanaskie's Opinion in the 1996 Litigation (which he was barred from doing) or improperly misinterpreted the unity of interest argument set forth therein.

230. Finally, in addition to misapplying the factual and legal conclusions of Chief Judge Vanaskie's Opinion, Judge Minora also misapplied the Third Circuit's decision regarding laches. In short, Judge Minora found that the pre-filing "delay" that the Third Circuit used as its basis for its laches decision reversing Chief Judge Vanaskie, somehow supported the "fact" that

Santana and its counsel had, as a matter of law, under taken an adequate investigation. Id. at 11. Again, Judge Minora provided no facts or case law to support this factual finding in the limited context of the preliminary objections.

231. A Notice of Appeal from Judge Minora's decision has been filed with the Pennsylvania Superior Court and briefing is to commence in October, 2007.

## VII.    COUNT I – VIOLATION OF PENNSYLVANIA'S DRAGONETTI ACT

232. Plaintiffs Hornyak and Bobrick incorporate by reference paragraphs 1 through 231 above as if set forth fully herein.

233. Bobrick and Hornyak were forced to defend against complex federal litigation initiated in 1996 and perpetuated for nine long, tortuous years without probable cause. The litigation was finally terminated on November 28, 2005 successfully in favor of the Plaintiffs herein. Without any basis in law or fact, Defendants commenced and continued to prosecute their meritless claims against Plaintiffs, even after fatal flaws were brought to their attention.

234. Therefore, Defendants improperly procured, initiated and continued civil proceedings against Hornyak and Bobrick in the 1996 Litigation.

235. For the reasons previously stated, Defendants acted in a grossly negligent manner or without probable cause and primarily for a purpose other than that of securing the proper discovery, joinder of parties or adjudication of the claim in which the proceedings were based.

236. Defendants Lynch, Sr., Carney and Gavigan, with the advice of Defendant Jackson, authorized the filing of the Complaint naming Hornyak and Bobrick as defendants and they reviewed the Complaint and discussed it with Jackson before it was filed by Gerald J. Butler, Esquire, at the direction of Defendant Jackson. See Lynch 1/12/00 Dep. at 278-79, Exh. 8 hereto.

237. For the reasons previously stated, Defendants Santana, Lynch, Sr., Lynch, Jr., Carney, Gavigan, and Jackson engaged in the conduct described above – especially in continuing to prosecute these claims against Hornyak and Bobrick after discovery and further binding legal opinions revealed their baselessness – in bad faith.

238. Defendants Santana, Lynch, Sr.. Lynch, Jr., Carney, Gavigan and Jackson's conduct described above was willful, intentional, reckless, grossly negligent and/or outrageous.

239. Specifically, Defendants Santana, Lynch. Sr., Lynch, Jr., Carney and Gavigan, with the advice and counsel of Defendant Jackson, acted primarily for the purpose of harassing Hornyak and Bobrick with previously known baseless litigation and/or attempting to improperly cause California-based competitor Bobrick to settle the 1996 Litigation by using Hornyak as a hostage.

240. Defendant Jackson played an integral role in the procurement, initiation and continuation of known baseless civil proceedings against Hornyak and Bobrick. Jackson was actively involved in setting the machinery of the law in motion with respect to the 1996 Action against Hornyak and Bobrick. See Gavigan 1/6/00 Dep. at pp. 33-34 and 37-38, Exh. 4 hereto. Defendant Jackson was assisted in doing so by B. Aaron Schulman, Esquire and other attorneys at Larson & Taylor, as well as Gerald J. Butler, Esquire.

241. Defendant Jackson's conduct was grossly negligent in failing to adequately investigate the underlying claims, and, in initiating and maintaining the 1996 Action against Hornyak and Bobrick without probable cause.

242. When the 1996 Action was commenced, Jackson knew, or should have known, that all of Santana's claims against Hornyak were groundless based on his alleged investigation and communications with other counsel, as described herein.

243. Similarly, when the 1996 action was commenced, Jackson knew, or should have known, that Santana's antitrust and tortious interference claims against Bobrick were equally groundless based on his alleged investigation and communications with other counsel, as described herein.

244. Defendant Jackson's conduct was grossly negligent in continuing to maintain the 1996 Action against Hornyak and Bobrick after discovery and court rulings had made clear that there was no reasonable basis for Santana's claim against Hornyak and Bobrick.

245. By initiating and continuing the 1996 Action against Hornyak and Bobrick, Jackson was not acting primarily for purpose of securing a proper adjudication of legitimate claims.

246. Instead, Defendants' intention was to improperly use Hornyak's status as a defendant in the 1996 Action, to pressure Santana's competitor *Bobrick* into seeking a settlement favorable to Santana. In short, their improper and malicious purpose was to hold Hornyak (and others) as innocent hostages in the 1996 Action in order to affect the outcome of Santana's meritless dispute with Bobrick.

247. The underlying proceedings finally terminated in full favor of Hornyak and Bobrick on November 28, 2005 when the Supreme Court denied Santana's meritless Petition for Certiorari.

248. Accordingly, Defendants have violated Pennsylvania's Dragonetti Act, entitled "Wrongful Use of Civil Proceedings," 42 Pa. C.S.A. § 8351, and are jointly and severally liable pursuant to that Act.

WHEREFORE, Plaintiffs Hornyak and Bobrick request that this Court:

    (a) Award judgment in favor of Plaintiffs Hornyak and Bobrick and against Defendants, holding them jointly and severally liable;

    (b) Award Plaintiffs Hornyak and Bobrick compensatory damages in an amount to be determined at trial, which is at least in excess of $75,000;

    (c) Award Plaintiffs Hornyak and Bobrick the costs of suit, including reasonable attorneys' fees and costs;

    (d) Award Plaintiffs Hornyak and Bobrick all other losses and damages that have resulted from the proceedings, pursuant to 42 Pa. C.S.A. § 8353;

    (e) Award Plaintiffs Hornyak and Bobrick punitive damages, pursuant to common law and/or 42 Pa. C.S.A. § 8353(5); and

    (f) Grant Plaintiffs Hornyak and Bobrick such other relief as the Court deems just and appropriate.

## VIII.  COUNT II – ABUSE OF PROCESS

249.  Plaintiffs Hornyak and Bobrick incorporate by reference paragraphs 1 through 248 above as if set forth fully herein.

250.  As set forth above, Defendants, by filing claims they knew in the face of their alleged investigation and binding published authority, were baseless, and by continuing to prosecute those claims even after discovery and further binding published authorities made the baseless nature of those piled on claims and damages even clearer, and after being placed on repeated notice of their baseless nature, engaged in an improper, unwarranted, unauthorized and perverted use of process and demonstrably employed process in a manner not contemplated by law as a means to coerce, harm, and/or oppress Plaintiffs Hornyak and Bobrick.

251.  Defendants had an ulterior motive in exercising such illegal, perverted or improper use of the process – i.e., to coerce, harm, and/or oppress Plaintiff Hornyak and/or force its competitor California-based competitor Bobrick to settle the 1996 Litigation to free one of its

architectural representatives Hornyak, which was being held as an innocent hostage in the

baseless harassing litigation against Bobrick.

252.  Defendants' conduct caused damages including, but not limited to, the

expenditure of substantial attorneys' fees and costs in individually and jointly defending against

Santana's baseless claims.

WHEREFORE, Plaintiffs Hornyak and Bobrick request that this Court:

(a)  Award judgment in favor of Plaintiffs Hornyak and Bobrick and against
Defendants, holding them jointly and severally liable;

(b)  Award Plaintiffs Hornyak and Bobrick compensatory damages in an
amount to be determined at trial, which is at least in excess of $75,000;

(c)  Award Plaintiffs Hornyak and Bobrick the costs of suit, including
reasonable attorneys' fees and costs;

(d)  Award Plaintiffs Hornyak and Bobrick punitive damages; and

(e)  Grant Plaintiffs Hornyak and Bobrick such other relief as the Court deems
just and appropriate.

## JURY DEMAND

A trial by jury is demanded as to all claims.

Dated: August 17, 2007

Carl W. Hittinger, Esquire
Identification No.: 30250
Lesli C. Esposito, Esquire
Identification No.: 201916
Nicholas T. Solosky, Esquire
Identification No.: 94114
DLA Piper US LLP
1650 Market Street, 49th Floor
Philadelphia, PA 19103
(215) 656-2449 (p)
(215) 606-2149 (f)
carl.hittinger@dlapiper.com

Walter F. Casper, Jr., Esquire
Identification No.: 59494
35 S. Church St. & Seventh Ave.
P.O. Box 513
Carbondale, PA 18407
(570) 282-6910

Attorneys for Plaintiffs

## VERIFICATION

I, *Mark Louchheim* hereby state that I am the President of Bobrick Washroom

Equipment, Inc. and President of The Bobrick Corporation and am authorized to verify the

foregoing First Verified Complaint on its behalf in this action. I have read the foregoing First

Verified Complaint and verify that the factual allegations contained therein are true and correct

to the best of my knowledge, information and belief.

I understand that this Verification is executed subject to the penalties of 18 Pa.

C.S.A. § 4904 relating to unsworn falsification to authorities.


_____
Mark Louchheim

Dated: August *10*, 2007

**VERIFICATION**

I, _____, hereby state that I am the President and Chief Executive

Officer of Plaintiff The Hornyak Group, Inc. and am authorized to verify the foregoing First

Verified Complaint on its behalf in this action.  I have read the foregoing First Verified

Complaint and verify that the factual allegations contained therein are true and correct to the best

of my knowledge, information and belief.

I understand that this Verification is executed subject to the penalties of 18 Pa.

C.S.A. § 4904 relating to unsworn falsification to authorities.


Dated:  August 10, 2007

Stephen T. Hornyak

Court Name: Pennsylvania Middle
Division: 3
Receipt Number: 33306?034
Cashier ID: cwimmer
Transaction Date: 08/17/2007
Payer Name: DLA PIPER

CIVIL FILING FEE
 For: CARL HITTINGER
 Amount:        $350.00

CHECK
 Check/Money Order Num: 714569
 Amt Tendered: $350.00

Total Due:     $350.00
Total Tendered: $350.00
Change Amt:     $0.00

Only when bank clears the check or
verifies credit of funds is the fee
or debit officially paid or
discharged. A $45.00 fee will be
charged for returned checks.

**FILED**
SCRANTON

AUG 17 2007

MARY E. D'ANDREA, CLERK
Per_____
        DEPUTY CLERK